Court is not to be recognized in these arbitration proceedings and the standing of the receiver of FEG is to be denied.

63. Respondent has denied the allegations above. In its opinion, Claimant repudiated the Contract and left Respondent with no choice but to seek conservatory measures to protect its interests. Moreover, Respondent alleges that FEG's management left the site and the country without paying employees, contractors and social security contributions and, thus causing social unrest. For that reason, Respondent had to pay these claims and was, thus, authorized to institute the bankruptcy proceedings.

64. Respondent has objected to the jurisdiction of the Arbitral Tribunal on the basis of the wording of the arbitration clause of the Contract. No facts other than the allegations above, have been invoked as to this jurisdictional defence which is, thus, a legal question of the interpretation of the arbitration clause.

65. Both the receiver and Respondent have argued that FEG's management has no standing in these arbitration proceedings because of the insolvency of FEG under which only the receiver is authorized to represent FEG. FEG's management has disputed that it is no longer authorized to represent FEG and has argued that FEG's insolvency is not to be recognized in these arbitration proceedings and, thus, that FEG's receiver has no standing in these proceedings. This issue does raise a number of relevant facts which are summarized below.

66. By judgment dated February 22, 2007, the District Court of Malabo, Equatorial Guinea (*Tribunal de Première Instance*) has pronounced the insolvency of FEG (*liquidation des biens*). The insolvency order drafted in the French language was communicated to the Arbitral Tribunal as an enclosure to the fax of the receiver dated July 27, 2007.

67. The insolvency orders indicates that the insolvency proceedings were instituted at the initiative of the Public Prosecutor of the Republic of Equatorial Guinea dated December 8, 2006 ("*Sur saisine de Monsieur le Procureur de la République de Guinée Equatoriale aux fins de liquidation des biens de la société FITPATIRCK*

15

EQUATORIALE GUINEA LTD.") as well that on January 16, 2007, the request of the Public Prosecutor was declared admissible.

68.   The insolvency order in its relevant parts for these arbitration proceedings reads as follows:

*"Attendu que suivant saisine en date du 08 décembre 2.006, Monsieur Le Procureur de la République de Guinée Equatorial a saisi la juridiction de céans afin d'obtenir le prononcé d'un jugement tendant à la liquidation des biens de la société FITZPATRICK EQUATORIAL GUINEA LTD. Immatriculée au registre de Commerce de Malabo sous le 211 ;*

*Qu'il a exposé à l'appui de sa requête que les dirigeants de la société FTIZPATRICK EQUATORIAL GUINEA LTD, ont abandonné les chantiers dont ils avaient en charge l'exécution et quitté subitement le pays en laissant des dettes vis-à-vis des entreprises de la place et surtout des salariés de leur société ainsi que des organismes sociaux concernés ;*

*Que cette dernière situation, pour Monsieur le Procureur de la République Guinée Equatoriale, a porté gravement atteinte à l'ordre public, les dirigeants sociaux de FITZPATRICK EQUATORIAL GUINEA LTD, ne s'étant plus manifestés pour remédier à cette grave situation qui caractérise la cessation manifeste de paiements de ladite société et sa situation financière irrémédiablement compromise ;*

*Que, d'ailleurs, il ressort des informations et pièces communiques au Tribunal que l'Etat de Guinée Equatoriale, pour éviter des troubles sociaux, s'est substitué à ladite société pour désintéresser ses salariés des rémunérations qui leur étaient dues palliant ainsi à la défaillance de la société FITZPATRICK EQUATORIALE GUINEA LTD ;*

*Attendu qu'il est constant qu'aucun des dirigeants ou responsables de FIYZPATRICK EQUATORIALE GUIEA LTD. ne se trouve plus en République de Guinée Equatoriale depuis qu'ils ont rompu unilatéralement, brutalement et de façon totalement infondée le contrat les liant à l'Etat en abandonnant les travaux et les employés de ladite société et ce, nonobstant le*

16

> *faire qu'ils avaient perçu un montant très substantiel au titre d'une avance de démarrage ;*
>
> *Attendu que malgré l'accomplissement de toutes les formalités de publicité inhérentes à la présence procédure et prévues par les textes applicables en la matière, ils n'ont pas comparu ;*
>
> *Qu'il échec donc de constater la cessation d'activités ainsi que la cessation des paiements de FITZPATRICK EQUATORIALE GUINEA LTD en fixant sa date provisoire au 18 septembre 2.005*
>
> *..."*

69. Claimant's management alleges that it was not aware of the insolvency order until May 15, 2007 when the receiver sent it a letter (fax dated July 27, 2007 of its then counsel Mr. Weare). Respondent's counsels were also aware of the insolvency at that time (see Mr. Page's fax dated July 24, 2007 with the letters of the receiver dated May 15, 2007 enclosed).

70. On July 18, 2007, Mr. Mbomio Nvó on behalf of FEG filed an appeal for nullity of judicial actions (*Recurso de nulidad de actuaciones judiciales*) against the insolvency order of the District Court of Malabo with the First Chamber of the Supreme Court of Justice of Equatorial Guinea (see the attachment to Mr. Weare's fax dated July 27, 2007). The appeal mentions that the insolvency order was served on Mr. Nvó on July 27, 2007 but this must be an error.

71. On October 2, 2007, the Supreme Court of Justice dismissed the appeal as inadmissible since it ought to have been brought before the Court of Appeal of Equatorial Guinea (C-28).

72. On October 3, 2007, the chief registrar (*greffier en chef*) of the District Court, Mr. Hermegildo Maye Oyana, signed a declaration on the District Court's letterhead to the effect that the insolvency judgment was served on FEG's attorney, Mr. Ponciano Mbomio Nvó, current co-counsel of FEG's management in these arbitration proceedings, who refused to accept service. This declaration was sent as

17

an attachment to an e-mail of the receiver to the Arbitral Tribunal dated October 5, 2007 (see also R-8).

73. On October 10, 2007, the receiver also sent to the Arbitral Tribunal a copy of two notices to creditors published in the periodical Ebano, no. 191, special edition 12 dated October 2007 in which creditors were requested to file their claims in the insolvent estate of FEG (see also R-7). On October 8, 2008, the receiver sent a subsequent notice to creditors of FEG published in Ebano, No. 192 of October 29, 2007.

## III. Claims and Arguments of the Parties

74. This section sets forth the claims and arguments of the Parties in relation to the preliminary issues. Any other claims and arguments are reserved for further arbitration proceedings, if the Tribunal were to accept jurisdiction.

### III.1 Claimant's Position as Advanced by the Management of FEG

75. Claimant alleges that Respondent is in breach of its obligations under the Contract and that it was entitled to terminate the Contract. In relation thereto, Claimant has the following prayers for relief: (i) a monetary claim for an amount of CFA Francs 14,939,299,635-, being additional moneys due under the contract, or as damages for breach of contract; (ii) reimbursement of its legal costs and associated expenses of pursuing the arbitration, together with the costs and fees charged by the International Chamber of Commerce and the arbitral tribunal. Claimant reserves its right to revise the quantum of its claim in the course of the arbitration, whether to take account of an increased entitlement to recover interest, or otherwise.

76. As to the jurisdictional issue, Claimant as represented by FEG's management has disputed Respondent's jurisdictional defence and has argued that Article 40 of the Contract provides a sound basis for submitting contractual disputes to the Arbitral Tribunal under the ICC Rules of Arbitration. In this respect, it has advocated that Article 40 of the Contract provides a two-tier dispute resolution process under

18

which, absent an amicable settlement of the dispute, it was entitled to institute ICC arbitration proceedings. In its opinion, Article 40 is to be interpreted as a non-exclusive arbitration clause giving an option to either party to choose between court litigation and ICC arbitration. The management also takes the position that the words *"en última instancia"* does not change this characterization and that the clause would have been drafted differently if it were to have the meaning attributed to it by Respondent. Furthermore, the management has argued that if two interpretations are plausible, effect is to be given to the interpretation that enforces a contractual provision over an interpretation that would make it a nullity. Finally, the management advocates that, in case of doubt, the arbitration clause is to be interpreted against Respondent since it was responsible for the drafting of the Contract (*contra proferentem rule*).

77. Alternatively, FEG's management takes the position that the conservatory arrest on its premises and equipment constituted proceedings in Equatorial Guinea and not having proceeded there, authorized it under Article 40 to start ICC arbitration proceedings.

78. Moreover, Claimant's management considers that in exchanges of correspondence between counsel, counsel for Respondent has indicated that ICC arbitration was the dispute resolution process to be followed amounting to a waiver of its jurisdictional defence or to an estoppel by representation. The management also invokes that the filing of counterclaims in these proceedings amounts to any such waiver.

79. Finally, the Arbitral Tribunal understands that Claimant's management invokes that there is no access to justice for FEG in the courts of Equatorial Guinea and that, for that reason, this Arbitral Tribunal has jurisdiction under Article 40 of the Contract.

80. As to the issue of standing (*i.e.*, whether the management of FEG or FEG's receiver is authorized to represent FEG in these arbitration proceedings), the management disputes the receiver's standing and argues that it alone can represent FEG. In this respect, the management considers that FEG's insolvency does not comply with the laws of Equatorial Guinea and international law and is in disregard of the current

19

ICC arbitration proceedings. It has advocated that FEG's insolvency is a sham and has been opened after the filing of these arbitration proceedings in order to frustrate these. In its opinion, the insolvency order of the Court of Malabo does not have extra-territorial effects and should not be recognized for violation of international policy as the insolvency has been manipulated by state organs of the Republic of Equatorial Guinea to escape the obligations of the Republic under the Contract.

81. Moreover, FEG's management claims that FEG is not bankrupt and that none of its creditors petitioned for bankruptcy. Also, it argues that FEG has never been invited to appear in bankruptcy proceedings and that the insolvency order has been obtained in violation of due process.

82. Initially, the management has stated that the OHADA Uniform Act on Bankruptcy of April 10, 1998 does not apply since it was never published in the Official Gazette of the Republic of Equatorial Guinea and that the insolvency proceedings did not comply with the applicable Articles 870 to 941 of the Codigo de Commercio of August 22, 1885 and the Ley de Suspención de Pagos y de Quiebra of 1922.

83. Later, the position was taken that the insolvency order did not meet the requirements of Article 28 of the Uniform Act as the insolvency proceedings were not brought by a creditor for claims unquestionable, liquid and due, specifying the nature and amount of the claim and evidencing liabilities and served upon FEG. Alternatively, the management complains of violation of Article 29 of the Uniform Act which requires service on the debtor if the Court examines the matter of its own motion as well as a court hearing at which the debtor is invited to attend and a thirty day period for the debtor to formulate a proposal of composition of creditors.

84. In its Memorial date June 6, 2008, Claimant's management seems to have reduced its complaints as to the regularity of the insolvency proceedings in Equatorial Guinea to violations of Article 29 of the Uniform Act. In this respect, it has noted that FEG was not insolvent since it has a claim on Respondent regarding the termination of the Contract which is the subject of these arbitration proceedings. Not having properly served of the institution of the insolvency proceedings, it could

20

not bring that information to the attention of the District Court. The management has also argued that there were no outstanding claims of employees since these were paid by Respondent and Respondent ought to have filed a counterclaim in these arbitration proceedings to be reimbursed for any such payments.

85. On the basis of these arguments, Claimant has requested the Arbitral Tribunal to accept jurisdiction and to declare that only the management of FEG – with the exclusion of its receiver – is authorized to represent FEG in the current arbitration proceedings.

## III.2 Claimant's Position as Advanced by its Receiver

86. At the occasion of the hearing, the receiver has confirmed that he did not contest the jurisdiction of the Arbitral Tribunal to decide on the disputes arising under the Contract.

87. At the occasion of the preparation of the ToR and during the arbitral proceedings thereafter, the receiver has requested that its position on certain issues be recorded. In this respect, he has pointed out as follows:

- The company Fitzpatrick Equatorial Guinea, the Claimant herein, is a company incorporated in, and in accordance with the laws of Equatorial Guinea. It is therefore subject to the law of Equatorial Guinea and in particular all questions of its status and matters relating to its insolvency are subject to such law.

- That the liquidation of Fitzpatrick Equatorial Guinea (FEG) was ordered by Judgment of 22nd February 2007 rendered by the First Instance judge of Malabo, Equatorial Guinea.

- That the judgment included a provision for "exécution provisoire" i.e. immediate enforcement in accordance with Article 217 of the Acte Uniforme de l'OHADA which provides for the organisation of collective proceedings for settlement of debts (i.e. insolvency proceedings).

21

- That in any case no appeal has been made nor opposition raised within the time legally permitted under Articles 216 to 225 of the Acte Uniforme de l'OHADA relating to insolvency proceedings, the law applicable in the Republic of Equatorial Guinea and the judgment ordering liquidation of FEG is now final and with "autorité de la chose jugée".

- That the recitals in the Judgment of 22nd February 2007 confirm that the procedure provided for under Article 29 of the Acte Uniforme de l'OHADA relating to insolvency proceedings has been respected. These recitals are legally binding and of enforceable effect vis-à-vis the former directors of FEG.

- That the regularity of the procedure which resulted in the liquidation of FEG under the Acte Uniforme de l'OHADA is therefore established and in particular with regard to the provisions of Article 29 thereof.

- That if there existed any grounds which could affect the validity of the said judgment, with regard to respecting the formalities of Article 29 cited above, the former officers of the Company should have raised them in due time before the competent jurisdiction in Equatorial Guinea. They cannot today attempt to bring up points of this nature which are evidently (i) too late, (ii) before the wrong jurisdiction and (iii) in any case unfounded.

88. The liquidator has further confirmed as follows:

- To have proceeded in accordance with the provisions of the Acte Uniforme de l'OHADA and to have taken the steps provided for under Article 38 of the said Act relating to the verifications required of him that the clerk of the Court had completed the formalities relating to the notices and publicity required under Articles 36 and 37.

- To have carried out the formalities of publicity required under the Acte Uniforme de l'OHADA in the newspaper EBANO which fulfils the function of the gazette of legal announcements.

22

- However he cannot be concerned, legally, by a claim relating to steps which were supposed to be carried out prior to his appointment as liquidator.

89. In view of the above, the liquidator has requested the Arbitral Tribunal: to decide as a preliminary question the issue relating to the representation of FEG and this by way of a preliminary award in accordance with the ICC rules; to comply with the arbitral case law which is well established in this area and consequently to « tenir informé et de considérer comme acteur de l'instance arbitrale le mandataire judiciaire ou tout autre organe désigné comme représentant légal de la partie soumise à la procédure collective », (Emmanuel Jolivet, Quelques exemples de traitement du droit des procédures collectives dans l'arbitrage, Gazette du Palais, 14 décembre 2006, n° 348, p. 16); to ensure, in accordance with the well-established arbitral practice in case of a company which is subject to insolvency proceedings, « que le demandeur soit désormais assisté ou représenté par les administrateurs ou de mandataires judiciaires compétents », as confirmed by Professeur Philippe Fouchard (Fouchard, Arbitrage et faillite, Revue de l'arbitrage, 1998, n° 3, p. 485); consequently to declare that the only person who has capacity to represent FEG is, contrary to the position maintained by the former directors of the Claimant, not these latter individuals or the company Fitzpatrick International Limited, but is in fact Mr Mamadou Badiane in his capacity as liquidator of FEG (the Claimant) who has been appointed as such by the competent Court in Malabo.

### III.3 Respondent's Position

90. Respondent has taken the position that Claimant's arguments lack merit and that the claims are to be dismissed. In that respect, Respondent has developed the following reasoning.

91. Respondent has contested the jurisdiction of the Arbitral Tribunal and has disputed that Claimant was entitled to terminate the Contract. In this respect, Respondent has submitted (part) of an interim report prepared by Mr. Paul R. Battrick. It has indicated to the ICC that it intends to file a counterclaim for a minimum of 11.1 billion CAF in relation to the alleged wrongful termination of the Contract by

23

Claimant; any such amount to be increased with additional costs related to completion of the project by different companies and delays.

92. Respondent has, further, taken the following position as to certain issues.

93. As to jurisdiction, the Respondent considers that the jurisdiction clause is defective. The way in which Article 40 is written and in particular the order of different jurisdictions provided under such Article, requires the Parties to submit any dispute firstly to the competent Court in Equatorial Guinea and secondly to arbitration before the ICC. However, if there is a decision of the Courts of Equatorial Guinea, it is impossible for the same dispute to be dealt with thereafter by ICC arbitration. A jurisdiction clause cannot validly provide that a dispute will be decided successively by two totally separate jurisdictions, one of a State (the Courts) and the other by arbitration before the ICC.

94. Respondent, therefore, considers that the passage in the jurisdiction clause referring to the jurisdiction of the ICC in the last resort (apparently as a kind of appeal from the decision of the Courts of Equatorial Guinea), is a nullity. The ICC cannot have jurisdiction to hear an appeal relating to the decisions rendered by the State Courts.

95. Given the above, the Respondent submits that the jurisdiction clause (particularly as regards ICC arbitration) is a nullity and that the Arbitrators should find that they do not have jurisdiction.

96. If, contrary to the above arguments, the Arbitral Tribunal considers the jurisdiction clause to be valid, the Respondent has asked the Tribunal to ensure that the three stage procedure provided under Article 40 for dispute resolution is observed. This procedure is (i) to attempt an amicable settlement, (ii) if there is no settlement to submit the dispute to the competent Courts of Equatorial Guinea and (iii) it is only in the last resort that Article 40 provides for this dispute to be resolved by arbitration before the ICC. The Respondent submits that, by referring the dispute directly to the ICC, the Claimant has not respected the provisions of Article 40, (assuming such Article to be valid, which the Respondent considers not to be the

24

case). Thus, the Respondent has asked the Tribunal to declare itself not to have jurisdiction to decide upon the claims presented by the Claimant as they have to be presented first to the Courts of Equatorial Guinea.

97.    In the above circumstances, the Respondent has asked the Arbitral Tribunal to make a preliminary finding on the question of jurisdiction, on the alternative grounds set out above, by way of a preliminary award.

98.    As to the representation of the Claimant company, the Respondent has set out that, according to established arbitration case law, one of the most important consequences resulting from the commencement of insolvency proceedings is "the requirement to keep informed and to consider the receiver/liquidator or other person appointed to be the authorised person to act in arbitral proceedings as legal representative of the party being the subject of insolvency proceedings". The liquidator should therefore be recognised as the person having capacity to represent the Claimant.

99.    This is of particular importance, given that the Respondent requires any decision that the Tribunal might make to be enforceable against the liquidator in his quality as representative of the company in liquidation and, thus, to avoid in future any possible challenge that could be made by the liquidator. If he is not the representative of the Claimant in these proceedings, the liquidator could claim that due to this fact, the proceedings are not valid, as regards any decision that the Respondent may wish to rely upon, for example during enforcement proceedings. It is essential, for any award be enforceable against the Claimant company, that the Claimant be represented by the liquidator.

100.    The law applicable to the liquidation of the Claimant, a company incorporated in Equatorial Guinea, is the law of Equatorial Guinea including the OHADA Treaty and the Uniform Act, not the Spanish laws of 1888 and 1922 as the OHADA Treaty entered into force on August 13, 1999 and the Uniform Act on January 1, 1999 and Article 10 of the OHADA Treaty and Article 257 of the Uniform Act repeal any pre-existing statutes.

101. There is nothing which gives reason to doubt the regularity of the liquidation procedure relating to the Claimant having regard to the applicable law and in particular in the following respects: the procedure by which the Court was seized of the matter; the giving of notice; the respect of the formal requirements of the liquidation judgment; the respect of publicity formalities relating to the judgment and the fact that no appeal has been made against the liquidation judgment. In this regard, Respondent has noted that the insolvency order of the Malabo Court clearly indicates that the management of FEG had left Equatorial Guinea and that all statutory requirements regarding service had been complied with.

102. For the reasons above, Respondent has asked the Arbitral Tribunal (i) to declare itself to be incompetent to hear the claims raised by FEG (and consequently also the counterclaims raised by the Respondent which were raised subject to jurisdiction); (ii) subsidiarily to decide, given the liquidation order, that the liquidator Mr Badiane is the proper and legal representative of FEG; and (iii) to note that the Respondent reserves the right to develop subsequently his counterclaim in damages for 11.1 billion CFA and other sums as may be appropriate to be added together with interest costs and arbitration costs, should these proceedings continue (Memorial p. 25).

103. On the basis of its arguments, Respondent has requested the Arbitral Tribunal to hold that it does not have jurisdiction and that only the receiver is authorized to represent FEG.

IV.   Analysis of the Arbitral Tribunal

104. Before embarking upon an analysis of the two preliminary issues, the Arbitral Tribunal will discuss the following issues: 1) the place of arbitration; 2) the applicable procedural rules; 3) the language of the arbitration; and 4) the law applicable to the merits.

26

## IV.1 Place of Arbitration

105. Absent a determination by the Parties in the Contract and by virtue of Article 14 (1) of the ICC Arbitration Rules, the ICC Court at its session of January 17, 2007 has decided that the place of arbitration is Paris, France.

## IV.2 Applicable Procedural Rules

106. By agreement of the parties, the rules governing the proceedings of this arbitration shall be the Rules of Arbitration of the International Chamber of Commerce and, where these rules are silent, by any rules which the parties or failing them the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.

## IV.3 Language of the Arbitration

107. Pursuant to the decision of the Arbitral Tribunal communicated to the parties on October 29, 2007, the language of the arbitration proceedings is the English language. This implies that communications by the Arbitral Tribunal, the Terms of Reference, Procedural Orders and awards are to be made in English. In other respects, the Tribunal has indicated that it would take a flexible attitude as to English or French as languages of communication by the parties, briefs, witness statements or expert reports but may order translations or interpretations into English.

## IV.4 Law applicable to the Merits

108. The Contract does not contain an applicable law clause. The Terms of Reference in these proceedings provide as follows:

27

> *"By virtue of Article 17 (1) of the ICC Arbitration Rules, the parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate. Respondent considers that the law of Equatorial Guinea (including the OHADA law) is the most appropriate, given that it is the national law common to the parties and the law of the place of performance."*

109. From the above, it follows that the Parties have not agreed on the law applicable to the merits either in the Contract or at the time of the execution of the Terms of Reference in these proceedings. Also during the proceedings in relation to the preliminary issues up to today, the Parties have not agreed on the law applicable to the merits of their disputes. The Tribunal will revert later in this Award to issues regarding applicable law.

110. After a discussion of the issues above, the Arbitral Tribunal now turns to its analysis of the two preliminary issues: 1) Jurisdiction; and 2) Standing of FEG's management alternatively of the receiver.

## IV.5 Jurisdiction

111. Article 40 of the Contract provides as follows:

> *"Artículo 40. – LITIGIOS*
>
> *En caso de litigio, las partes se reunirán para obtener una solución amigable, caso contrario, se someterán a los tribunales de Guinea Ecuatorial ; o en última instancia el asunto se dilucidará según el procedimiento arbitral de la Cámara de Comercio International. "*

28

112. As an English translation of the Contract is also available (Claim Documents, April 26, 2006, Volume 2, Tab 2), Article 43 of the Contract also needs to be quoted:

> "*Articulo 43 – IDIOMA.*
>
> *El presente contrato, asi como sus anexos están redactados en español, francés e inglés. Para cualquier divergencia que pudiera surgir en la interpretación, aplicaión o ejecución del contrato, la versión en español prevalecerá.*"

113. The provisions above read as follows in the English translation:

> "*Article 40. – DISPUTES*
>
> *In the event of disputes, the parties shall meet in order to reach an amicable solution. Otherwise, they shall submit any disputes to the courts of Equatorial Guinea, or, as a last resort, the matter shall be resolved according to the arbitration procedure of the International Chamber of Commerce.*"

> "*Article 43. – LANGUAGE*
>
> *The present Contract, and its annexes, are written in Spanish, French and English. In the event of any disagreement which may arise in the interpretation, application or performance of the Contract, the Spanish version shall prevail.*"

114. A French translation of the Contract has not been submitted in these proceedings. As to the English translation, it is not signed by the Parties and the accompanying letter by the translator is dated August 27, 2004 (*i.e.*, after the conclusion of the Contract). For these two reasons, the English translation cannot be taken into account in the process of the interpretation of the arbitration clause and the jurisdiction of the Arbitral Tribunal can, thus, only be determined on the basis of the Spanish version of the clause.

29

115. Article 40 of the Contract might seem at first sight ambiguous and needs to be interpreted. For the management of FEG and for its receiver, it leads to jurisdiction of this Arbitral Tribunal whereas for Respondent it does not.

116. The Parties have hardly or not at all addressed the issue as to the law applicable to Article 40 of the Contract and its interpretation. This is quite understandable as interpretation on the one hand involves the determination of the matrix of facts underlying the contractual obligations of the Parties and, on the other hand, is governed by general principles of law which are common to the legal systems involved as they pertain to the same legal family. The law of Equatorial Guinea as the law common to both Parties as they are based there and as the Contract was to be performed there, is based on Spanish law. The law of France as the law of the place of arbitration is based on similar principles regarding contract interpretation.

117. Also, account is to be had of Article 17 of the ICC Rules as also confirmed in the Terms of Reference. In accordance with Article 17 of these Rules, absent a choice of law provision in the Contract, the Arbitral Tribunal is in all cases to take account of the provisions of the contract and, otherwise, is to apply the rules of law which it considers appropriate.

118. On the basis of the above, the Tribunal will primarily be guided by the provisions of the Contract, and in particular Article 40, in the process of interpreting the dispute resolution clause of Article 40 as well as by the principles of contract interpretation common in legal systems belonging to the Romanistic legal family (which also apply in Equatorial Guinea and France) and which are guided by the principle of looking for the intention of the parties when concluding the Contract.

119. All Parties are in agreement that Article 40 required the Parties to attempt to settle any difference in an amicable way. The Parties have tried but failed to do so.

120. The challenge as to the Tribunal's jurisdiction relates to the next step of the dispute resolution process under Article 40 of the Contract. Apart from other arguments raised during the proceedings on preliminary issues, the Parties' basic positions and

30

arguments relate to the question whether – under Article 40 of the Contract – FEG, absent an amicable settlement, was entitled to institute ICC arbitration proceedings or whether it had to resort first to the Courts of Equatorial Guinea. Claimant (both its management and its receiver) takes the former position while Respondent the latter.

121. The Tribunal – having considered all the arguments – concludes that Claimant should prevail on the jurisdictional issue and that, consequently, it has jurisdiction under Article 40 of the Contract to hear any disputes in relation to the Contract and such for the reasons below.

122. First, Respondent has argued that Article 40 of the Contract is a nullity to the extent that it provides for ICC arbitration following a decision by the state courts in Equatorial Guinea since arbitration cannot function as an instance of last resort against decisions of state courts. This argument is, however, based on the premise that Article 40 is to be interpreted as providing for a hierarchy between state court and arbitral dispute settlement in the sense that Article 40 of the Contract imposes an obligation first to institute court proceedings in Equatorial Guinea before arbitration can be instituted.

123. Respondent's second argument is in line with its first argument. Respondent has advocated that, if the Tribunal were to decide that Article 40 is not a nullity, it should enforce Article 40 of the Contract as it is drafted and decline jurisdiction since the dispute settlement mechanism to be followed first is that of the domestic courts of Equatorial Guinea. Also this argument is based on the premise that Article 40 of the Contract is to be interpreted as imposing a hierarchy between domestic courts and arbitration in the sense that the first tier of the dispute resolution clause is in favour of dispute settlement before the courts of Equatorial Guinea and the second tier (*i.e.*, ICC arbitration) only applies when local remedies in Equatorial Guinea have been exhausted.

124. Respondent's arguments are, thus, based on an interpretation of Article 40 of the Contract under which litigation is always first to be brought in the courts of

Equatorial Guinea. As such, the interpretation of Article 40 is a literal interpretation. Respondent, in this respect, has emphasized that there is a semi-colon in Article 40 and that Article 40 also contains the language "*o en última instancia*" implying that dispute resolution in the courts of Equatorial Guinea and before an arbitral tribunal under the ICC Rules are not alternatives at the option of either party (Memorial at p. 14) but are consecutive steps in a multi-tier dispute resolution clause. In this respect, Respondent has argued that the Spanish word "o" is not to be translated as "or" but as "subsequently followed by".

125. Respondent has also taken the position that Article 40 of the Contract is an incurable pathological clause because it does not exclude the jurisdiction of the courts of Equatorial Guinea (Memorial at ¶ 126, pp. 11-13). Also this argument is based on the premise that Article 40 of the Contract imposes an obligation first to litigate in the courts of Equatorial Guinea before ICC arbitration can be pursued. If that premise is correct, Article 40 would indeed not oust the jurisdiction of the courts in Equatorial Guinea and the arbitral clause would not authorize either party to start arbitration as long as litigation in Equatorial Guinea was not pursued.

126. All arguments, thus, seem to turn around the same issue as to whether Article 40 of the Contract must be interpreted as a multi-step dispute resolution clause providing for three steps (amicable settlement, domestic litigation and ICC arbitration) or as a two tier clause (amicable settlement, domestic litigation or ICC arbitration).

127. Respondent's arguments have two strong points: the semi-colon in Article 40 suggesting that there is a difference between court litigation and ICC arbitration under its scheme and the words "en última instancia". The convincing points in Claimant's arguments relate mainly to giving effect to the clause in its entirety and corresponding to the business context of the Contract. In weighing these arguments, the Tribunal will conclude that Claimant's position in favour of a clause providing for alternative dispute resolution mechanisms is to be retained and that it has jurisdiction over the disputes between the Parties under Article 40 of the Contract for the reasons below.

32

128. The Arbitral Tribunal, first, considers that the *contra proferentem* rule, according to which the Contract is to be interpreted against the party that prepared and drafted it, hardly applies in the instant case. Although Claimant alleges that Respondent prepared and drafted the Contract, the Tribunal has not found sufficient evidence of this. Furthermore, the rule is of a subsidiary nature and applies only in the interpretation of commercial contracts if other interpretation tools fail. In view of the considerations below, the Tribunal finds that it does not need to rely on the rule because other interpretation means have enabled it to interpret Article 40 of the Contract.

129. Second, the Arbitral Tribunal cannot follow Respondent in its argument that the word "o" means "subsequently followed by" rather than the disjunctive normal meaning under which an alternative is being presented. In this respect, the Tribunal has not found sufficient evidence that the interpretation advanced by Respondent is to be followed and has been convinced by the references by Claimant to various dictionaries (letter dated September 24, 2008, pp. 4-6; Exhibits C-45 thru C-53) making clear that "o" can be translated into "or". Moreover, as Respondent advances an interpretation deviating form the normal meaning, any such interpretation requires a heavier burden of proof which Respondent, in the opinion of the Arbitral Tribunal, has not met.

130. Thirdly, the Tribunal has to consider the use of the words "en última instancia" in Article 40 of the Contract. As Claimant has shown and Respondent has not contested, these words mean "as a last resort" (Claimant letter dated September 24, 2008). However, the Parties disagree as to whether this implies that the Parties should first submit disputes to the courts in Equatorial Guinea (as Respondent suggests) or whether it implies that these words cannot change the alternative nature of the dispute resolution clause as Claimant advances. From a purely literal interpretation perspective, the words "en última instancia" seem to suggest that ICC arbitration is the ultimate remedy after negotiations have failed to procure an amicable settlement and after local remedies in the courts of Equatorial Guinea have been exhausted. However, a purely literal interpretation is not decisive and other factors are to be taken into account. In this respect, two factors are particularly

33

relevant. First, the literal interpretation advocated by Respondent leads to the nullity of part of the clause if one were to accept that an ICC arbitral tribunal cannot sit as a superior court to the courts of national states. Second, the literal interpretation leads to the conclusion that the Parties in negotiating, drafting and signing the Contract agreed either to exclusive jurisdiction in favour of the courts of Equatorial Guinea (without any possibility to resort to ICC arbitration if the arbitration part of the clause is a nullity) or to compulsory jurisdiction of the courts of Equatorial Guinea as a precondition for being able to institute arbitration proceedings under the ICC Rules (if the arbitration part of the clause were to be valid). As the Tribunal will elaborate further below, it does not accept that the Parties intended or can be deemed to have intended to accept an invalid clause nor to submit to exclusive or compulsory jurisdiction in the courts of Equatorial Guinea. Consequently, the Tribunal considers that the words "en última instancia" alone cannot be decisive in the interpretation process. These words are ambiguous in context and need a broader interpretation process.

131. On the other hand, the Arbitral Tribunal cannot ignore the existence of the words "en última instancia". However, these words can be given a more logical interpretation if they are seen in the context of Article 40 as a whole. The Parties are in agreement that, under Article 40, they had first to seek an amicable settlement. The words "en última instancia" may be interpreted as envisaging not only ICC arbitration but also dispute resolution in the courts of Equatorial Guinea expressing that both litigation and arbitration were means of last resort and emphasizing the need for negotiations to seek an amicable settlement. Alternatively, the words "en última instancia" may have scant or no legal meaning and serve business or other purposes in the sense of expressing the Parties' reluctance to submit disputes to ICC arbitration. Also that interpretation is plausible: when negotiating and drafting the Contract, both FEG and the Government of Equatorial Guinea had an interest and may be deemed to have accepted that ICC arbitration was not lightly to be resorted to and in this sense a means of last resort. FEG was interested to obtain the business of building the motorway and to give an assurance to the Government that it would not lightly pursue any claims it might have against the Government in an ICC arbitration (rather than before the courts of Equatorial Guinea) and likewise the

34

Government has an interest in not lightly agreeing to ICC arbitration as an alternative to dispute resolution before its own courts. For the reasons above, the Tribunal considers that its interpretation of the words "en última instancia", under which these words are not decisive, do not make these words redundant but make sense if interpreted in a way different than the literal interpretation advanced by Respondent.

132. Fourthly, the Arbitral Tribunal, in its interpretation of Article 40, needs to take into account that Article 40 contains a semi-colon between the reference to the state courts of Equatorial Guinea and the arbitration part of the clause referring to ICC arbitration. Respondent has rightly pointed to the presence of this semi-colon which, in its opinion, suggests that the dispute settlement process before the courts of Equatorial Guinea are to be separated from the ICC arbitration provision in Article 40 and emphasizes that the former is a precondition for the latter. The Arbitral Tribunal appreciates this argument but is not convinced that the mere presence of a semi-colon in Article 40 necessarily leads to the three-step conclusion that Respondent advances. The literal interpretation on which Respondent's argument rests again meets the obstacles referred to above regarding the "en última instancia" words. First, the semi-colon argument may render the arbitration clause null and void and the question arises whether the Parties intended or may be deemed to have intended to conclude a nullity. Second, Respondent's reading of Article 40 based on the presence of a semi-colon turns Article 40 into an exclusive jurisdiction clause alternatively imposes the Parties first to litigate in the courts of Equatorial Guinea before ICC arbitration can be instituted and the question arises whether this was or could have been the intention of the Parties.

133. Here also, the Arbitral Tribunal cannot ignore the existence of the semi-colon which raises the question whether there is another plausible interpretation for it being there other than the interpretation defended by Respondent. It may be that the semi-colon was inserted inadvertently or redundantly. As mentioned previously, the drafter may have envisaged to emphasize the importance of the amicable settlement of the dispute but erred in putting the semi-colon and the words "en última instancia" after the reference to the courts of Equatorial Guinea rather than before. Moreover, the

35

semi-colon in Article 40 of the Contract likely is the result of a negotiating compromise between the Parties reflecting not so much legal language but an alternative dispute resolution process between the courts of Equatorial Guinea and ICC arbitration with comforting diplomatic language addressing the concerns of the Government for the negotiated waiver of the exclusive competence of its own courts.

134. The textual arguments above lead to the conclusion that neither of them (the word "o", the words "en última instancia" and the presence of a semi-colon) alone supports the literal interpretation advocated by Respondent. However, the Arbitral Tribunal needs to address the question whether the three arguments combined cannot support Respondent's conclusion. In this respect, the Tribunal does not think that the word "o" can be considered in the combined effect of the three elements above. It has not sufficiently been proven and has sufficiently been contested. That reduces the question to the combination of the presence of the semi-colon and the words "en última instancia". Considering the arguments above in relation to the discussion of these two elements taken into isolation, the Arbitral Tribunal considers that the elements taken together cannot support Respondent's conclusions and these arguments need not be repeated.

135. Having concluded that a literal interpretation of Article 40 of the Contract alone does not support Respondent's conclusions and leaves the ambiguity of Article 40 unsettled, the Arbitral Tribunal now turns to two reasons why in its opinion Article 40 needs to be interpreted as providing for alternative means of dispute settlement and, thus, to the Tribunal's jurisdiction over the disputes between the Parties.

136. First, Respondent's primary argument that the arbitration part of Article 40 is a nullity raises the question whether the outcome of the interpretation process may lead to the nullity of Article 40 or of any part thereof. In other words, the question needs to be addressed whether the Parties intended or may be deemed to have intended that Article 40 or part thereof was a nullity. This question raises another one, *i.e.*, whether the arbitration clause of Article 40 creates any validity issues.

137. Respondent seems to assume that, in its reading of Article 40 of the Contract as a three-tier dispute settlement mechanism, the arbitration part as the final step of the mechanism is a nullity because it encroaches upon the judicial organization of the courts of Equatorial Guinea where the highest court has the final word and where its decisions cannot be supervised or reviewed in the course of subsequent arbitration proceedings. For the purposes of the interpretation of Article 40, the Arbitral Tribunal may depart from this assumption.

138. Respondent has argued that, if the third tier of the multi-step dispute resolution clause is invalid, this Tribunal could not have jurisdiction in the absence of a valid agreement to arbitrate. The question facing this Tribunal is, thus, whether Article 40 can be interpreted as implying that the arbitration part of the article is null and void. The Tribunal considers that the Parties cannot have intended or cannot be deemed to have intended to conclude an invalid arbitration clause. Faced with the choice between Respondent's interpretation of Article 40 to the extent that it is a nullity and Claimant's interpretation of Article 40 as an alternative dispute resolution clause making it a valid and enforceable clause, the Tribunal considers that the Parties intended or may be deemed to have intended to conclude a valid arbitration clause. The Tribunal considers that it can give preference to an interpretation which upholds the validity of an arbitration clause above an interpretation that would invalidate it. As such, it can give effect to the Parties' contractual obligations (*effet utile* interpretation). This principle is commonly accepted in Romanistic legal families to which Equatorial Guinea (as the place where the Contract was to be performed and where both Parties have their places of business) and France (as the place of arbitration) belong and goes back to the canon of construction *potius ut valeat* as codified for instance in France in Article 1157 of the Civil Code.

139. Secondly, in giving an interpretation to Article 40 of the Contract, the Arbitral Tribunal can go beyond the wording of the contract if that wording is unclear, ambiguous or equivocal and look to the underlying intentions of the parties. In this respect, Respondent has developed an alternative interpretation under which, if the arbitration part of Article 40 is valid, the wording of the clause imposes first to go before the courts in Equatorial Guinea and, only subsequently, to ICC arbitration. In

37

that perspective, this Tribunal would not have jurisdiction as no proceedings have been brought in the courts of Equatorial Guinea. As the Tribunal in the preceding paragraph has accepted that Article 40 is to interpreted in favour of validity, Respondent's alternative argument needs to be addressed. The Tribunal has concluded that this alternative argument also cannot be followed as the Parties cannot have intended or be deemed to have intended that they first would go through the courts in Equatorial Guinea and be able, thereafter, to institute ICC arbitration proceedings. Respondent has not cited any cases where parties have agreed to any such mechanism, any such mechanism is inefficient from a time and cost perspective and might expose any party to validity challenges at the outset, during and in the aftermath of arbitration proceedings. Consequently, it can be accepted that the Parties have never intended or deemed to have intended any such dispute resolution process and the interpretation of Article 40 of the Contract as an alternative dispute settlement process advanced by Claimant is to be preferred. The Parties have, thus, agreed first to attempt to reach an amicable settlement of their disputes and thereafter either to bring unresolved disputes before the courts of Equatorial Guinea or to institute ICC arbitration proceedings in relation to any such disputes. Claimant has preferred ICC arbitration and court proceedings in Equatorial Guinea are not a precondition to any such arbitration. On the basis of this alternative reading of Article 40 of the Contract, the Tribunal will hold that there is an arbitration clause under which Claimant was entitled to start ICC arbitration proceedings without first having to resort to the courts of Equatorial Guinea and that, consequently, it has jurisdiction to hear the disputes which are the subject of these arbitration proceedings.

140.   The Tribunal is strengthened in its conclusions because the alternative nature of the dispute resolution clause of Article 40 of the Contract also corresponds to the intentions of the Parties to agree upon a balanced dispute resolution process. Claimant may be deemed to have preferred arbitration outside of Equatorial Guinea to avoid litigation of disputes in the state courts of Respondent, especially in view of the State Contract nature of the construction contract where Respondent is the Government itself represented by one of its Ministries. Respondent may be deemed to have preferred litigating disputes in its own courts. Article 40 of the Contract

constitutes a compromise between these conflicting preferences and the interpretation that the Arbitral Tribunal has retained reflects the compromise the Parties have reached. Respondent's interpretation, on the contrary, would amount to deleting part of the contractual bargain and, thus, not reflecting the compromise.

141. The Tribunal's conclusion above is not altered by the fact that alternative dispute resolution clauses providing a choice between domestic courts and arbitration may cause practical problems in terms of creating risks of parallel procedures in domestic courts and before arbitral tribunals and ensuing problems of *lis pendens* and *res judicata*. These problems do not arise here because there are no parallel proceedings and effect is to be given to the autonomy of the parties in choosing for an alternative system of dispute resolution. Respondent's argument that Article 40 of the Contract is incurably pathological because it does not provide for arbitration as an exclusive means of dispute resolution is, thus, rejected. If the argument were followed, there also would be problems with the choice of forum part of Article 40 of the Contract providing for exclusive jurisdiction of the courts of Equatorial Guinea. The better view is that either part of the clause is exclusive but that the exclusivity depends on and is exercised by an option granted to either party. Any party as claimant may then exercise the option and decide whether its claims are to be submitted to the courts of Equatorial Guinea or to ICC arbitration.

142. By way of conclusion, the Arbitral Tribunal holds that Article 40 of the Contract must be interpreted as providing an alternative dispute resolution mechanism under which Claimant was entitled to bring the present arbitration proceedings and, consequently, the Arbitral Tribunal accepts jurisdiction to hear the disputes that the Parties have submitted to arbitration. The Tribunal does not consider that it has stretched the wording of Article 40 of the Contract beyond what it states, having given consideration to the intentions of the Parties when concluding the Contract.

143. Accordingly, the Arbitral Tribunal does not have to deal with Claimant's further arguments, particularly in relation to waiver, estoppel, lack of access to justice in the courts of Equatorial Guinea and prior submission to the courts of Equatorial Guinea regarding the seizure and insolvency proceedings, as these arguments are

39

redundant in view of the Arbitral Tribunal's reasoning above and cannot benefit Respondent in its defence as to the lack of jurisdiction of the Arbitral Tribunal.

IV.6   Standing of FEG's Management and of the Receiver

144.   The Parties are in agreement that FEG's management and the receiver cannot both have standing in these arbitration proceedings to represent the interests of FEG. Thus, the Arbitral Tribunal is faced with the question whether either the management of FEG has any such standing or whether the receiver must be accepted to represent the interests of FEG.

145.   From the perspective of the management of FEG, only it can represent Claimant whereas both the receiver and the Respondent argue that only the receiver can represent the interests of FEG. This divide boils down to the question whether the insolvency of FEG is to be recognized in these arbitration proceedings. For the management, the insolvency order is not to be recognized while the receiver and Respondent come to the opposite conclusion.

146.   For this Arbitral Tribunal sitting in France, the insolvency order of the District Court of Malabo can be recognized if the following requirements are met:

    1. The District Court of Malabo must have had jurisdiction over Claimant in relation to insolvency proceedings;
    2. The insolvency order must have become final and binding;
    3. The insolvency proceedings must have respected due process;
    4. Recognition of the insolvency order does not violate fundamental rules and principles pertaining to international public policy.

147.   These requirements are conditions of French law as the insolvency order has territorial effects only in Equatorial Guinea and any court or arbitral tribunal sitting outside Equatorial Guinea needs to assess whether the insolvency order can be recognized outside Equatorial Guinea. As this Arbitral Tribunal is seated in France

40

and France is the place of arbitration, French law will determine whether and to what extent a foreign insolvency order can be recognized. That does not necessarily imply that French law as to recognition of foreign judgments in French domestic courts is to be applied but only whether this Arbitral Tribunal is bound to recognize a foreign judgment in the course of arbitration proceedings in France. In this respect, the Arbitral Tribunal may be inspired by French principles on recognition by French domestic courts of foreign judgments including the principles of EU Regulation 44/2001 of December 22, 2000 on recognition of foreign judgments and in particular article 34 of this Regulation.

148. The Parties have not contested that the District Court of Malabo had jurisdiction regarding the insolvency of FEG since it is a company incorporated under the laws of Equatorial Guinea and had almost all its assets there as well as a substantial number of liabilities were to local creditors. No arguments to the contrary having been advanced, the Arbitral Tribunal accepts that the District Court of Malabo had jurisdiction to order the insolvency of FEG and the first requirement for recognition is, thus, met.

149. The receiver and Respondent take the position that the insolvency order of the District Court of Malabo is final and binding in the sense that no local remedies may be instituted against the order in order to challenge it. Claimant's management alleges, on the contrary, that the insolvency order ought to have been set aside by the Supreme Court of Justice of Equatorial Guinea and that the Supreme Court mistakenly declared the appeal against the insolvency order as inadmissible. However, assuming that there was an error of law in the decision of inadmissibility of the Supreme Court of Justice, it would not advance the management's position as to this second requirement for recognition. This second requirement only intends to protect the recognition process from giving effect to decisions which have not become final and binding at the place of origin of the decision and where local remedies or proceedings are still possible or pending. As it remained uncontested that no such further remedies and proceedings are possible or pending in the courts of Equatorial Guinea or any such proceedings have unsuccessfully been instituted,

41

the insolvency order of the District Court of Malabo has become final and binding and the second requirement for recognition mentioned above is met.

150. The insolvency order of the District Court of Malabo against FEG can be recognized in these proceedings if the proceedings met the requirements of due process and fair trial. Although there may be overlap with the requirement that recognition should not violate international public policy, observance of due process and fair dealing may be characterized as a separate requirement since it is more specific than the general condition of compliance with international public policy. Moreover, for an arbitral tribunal sitting in France, account may also be taken of the principle of Article 6 of the European Convention on Human Rights imposing fair trial.

151. For the receiver and Respondent, the insolvency proceedings in Equatorial Guinea met all local requirements including due process. In this respect, they relied upon the fact that the text of the insolvency order referred to the fact that all local publicity requirements were met. Moreover, reference was made to the declaration of the chief registrar of the District Court certifying that the insolvency order was served upon FEG's local counsel who refused to accept service.

152. The Claimant's management, however, indicated that it was unaware of the institution of the insolvency proceedings prior to the insolvency order and only became aware of the insolvency order on May 15, 2007 when the receiver wrote to its local counsel.

153. It has not been disputed that the insolvency order was rendered after *ex parte* proceedings and the order may, thus, be characterized as a default order. The question then arises whether the insolvency proceedings were properly served upon Claimant. No evidence of such service has been submitted in these arbitration proceedings apart from the text of the order itself that mentions that all applicable publicity requirements have been met. No further evidence such as a copy of a writ of summons, a registered letter, other communication to Claimant or publication in a journal or other publication has been submitted proving that, between the request

42

of the Public Prosecutor of December 6, 2006 and the insolvency order dated February 22, 2007, Claimant has been summoned to appear in any insolvency proceedings. At the hearing and in reply to questions of the Arbitral Tribunal, Mr. Diouf on behalf of the receiver, confirmed that there was no such evidence except for the order mentioning that all publicity requirements had been met and that the management of FEG had left the country (transcript pp. 57-58). Thus, it remains unclear whether service of process was effected on FEG or whether no service was effected because there was no longer any management or other person representing FEG in Equatorial Guinea.

154. In weighing the evidence as it appears only from one sentence in the insolvency order, the Arbitral Tribunal has to take into account the position of FEG's management that it has never been informed of the institution of insolvency proceedings in the relevant period between December 6, 2006 and February 22, 2007.

155. In view of the essential requirement of due process, the Arbitral Tribunal considers that the burden of proof that the institution of insolvency proceedings against FEG was properly and timely served upon Claimant, falls upon FEG's receiver and/or Respondent since they are claiming that the management of FEG has no standing in these arbitration proceedings by virtue of the insolvency order. Moreover, the receiver and Respondent are in the better position to have access to information establishing that proper service occurred.

156. On the basis of the assessment of the evidence and the burden of proof, the Arbitral Tribunal concludes that neither the receiver nor Respondent have sufficiently established that the institution of insolvency proceedings was served upon Claimant. The Arbitral Tribunal also considers that the receiver and/or Respondent can strictly be held to any such evidence in view of the essential nature of the requirement of due process and fair trial as embedded in French law as the law of the seat of these arbitration proceedings, including Article 6 of the European Convention on Human Rights as being part of French law.

43

157. Furthermore, the absence of sufficient evidence as to service of the institution of insolvency proceedings may have deprived Claimant of the opportunity to have its views heard at the outset of the insolvency proceedings, of having its case heard in all instances available under the laws of Equatorial Guinea and of solving its liquidity and/or solvency problems in any available composition or restructuring proceedings available under the laws of Equatorial Guinea, including further funding of its operations in Equatorial Guinea by its parent company or otherwise pending the outcome of the resolution of its disputes with Respondent under Article 40 of the Contract. The Arbitral Tribunal, thus, accepts that FEG's due process and fair trial rights have been violated by the fact that service of the insolvency proceedings has not been done timely and properly but also that any such violation had detrimental effects on FEG's business including its rights to enforce its claims under the Contract in these arbitration proceedings.

158. The Arbitral Tribunal's findings above are confirmed by the decision of the Paris Court of Appeal of January 12, 1993 in the case *République de Côte d'Ivoire v. Société Norbert Beyrard* (Rev.Arb. 1994, 686) referred to by the Parties in their submissions. Although this case involved setting aside proceedings against an arbitral award rendered in relation to an ICC arbitration in Paris and looked to the case from the perspective of the French grounds for setting aside arbitral awards, particularly as to compliance with international public policy, it is equally relevant for the disposition of this case with regard to service of the institution of insolvency proceedings. In its decision, the Court of Appeal considered that service according to local requirements was insufficient if no further investigation was done to see whether a party effectively received service under circumstances where it had ceased all activities in the country where service was done. The case is relevant here since it shows the importance of effective service to guarantee a party's due process rights. However, this case is distinguishable from the one the Arbitral Tribunal has to decide here because in the present case there is less evidence as to the means by which service has been effected and there is doubt here as to whether there was any service at all.

44

159. Moreover, the Arbitral Tribunal considers that there were alternative means of effecting service since, at the time of the institution of the insolvency proceedings, the Request for Arbitration had been filed and service could have been done at FEG's address indicated in the Request for Arbitration.

160. Finally, the Arbitral Tribunal considers that any other publication regarding the insolvency order such as the declaration of the chief registrar of the District Court of Malabo or the legal notices of the insolvency order in the periodical Ebano are irrelevant since they postdate the insolvency order and have no bearing on the question as to whether the institution of the insolvency proceedings was served on Claimant.

161. For the reasons above, the Arbitral Tribunal considers that the insolvency order of the District Court of Malabo dated February 22, 2007 cannot be recognized in these arbitration proceedings with seat in France since it has insufficiently been proven that the institution of these insolvency proceedings was properly and timely served upon Claimant. Consequently, the receiver has no standing in these arbitration proceedings and only the management of FEG will be authorized to represent FEG in the further proceedings after the rendering of this award.

162. As the Arbitral Tribunal has held that the insolvency order of February 22, 2007 cannot be recognized in these arbitration proceedings for want of proper and timely service of the institution of the insolvency proceedings on Claimant, the third requirement for recognition is not met and the Arbitral Tribunal does not need to address the fourth requirement whether recognition would comply with international public policy. The Parties have addressed this issue at some length and reference, in this respect, has also been made to the aforementioned decision of the Paris Court of Appeal of January 12, 1993 in the case *République de Côte d'Ivoire v. Société Norbert Beyrard* (Rev.Arb. 1994, 686). In that case, it was alleged and accepted by the Paris Court of Appeal that the Government of Ivory Coast initiated insolvency proceedings in Ivory Coast pending an arbitration proceeding in France and that any such initiation was aimed at frustrating the arbitration proceedings. The Paris Court of Appeal accepted that, under the circumstances of that case, the

insolvency order of the Ivory Coast courts could not be recognized in France for violation of French international public policy.

163.  As the Arbitral Tribunal has accepted that the insolvency order of the Malabo Court of First Instance of February 22, 2007 cannot be recognized in these arbitration proceedings because it has not sufficiently been proven that the institution of the insolvency proceedings were timely and properly served upon FEG, it does not need to address the fourth requirement as to the compatibility of the insolvency order with international public policy.

## IV.7   Further Proceedings and Costs

164.  As this Award only deals with the two preliminary issues identified above, any other decisions will be reserved for the further proceedings once the Award will have been notified to the Parties. Any such other decisions also include costs which are reserved for the further proceedings. Although FEG management has requested that this Award also awards costs (letter dated September 24, 2008), the Tribunal has decided to defer ruling on costs to the further proceedings. As to costs, there is one exception to the reservation of costs above. As the receiver in insolvency is not being accepted as entitled to represent the interests of Claimant in the further proceedings, the Arbitral Tribunal will have to decide on his costs and whether the insolvent estate is to contribute to the costs of the other parties. As the Tribunal has refused to recognize the insolvency for the purposes of these arbitration proceedings, the receiver in solvency cannot be ordered to pay whatever costs nor can the receiver be reimbursed for any costs related to these arbitration proceedings. An order to that effect will be made in the operative part of this Award.

165.  After notification of this Award to the Parties, the Arbitral Tribunal – after consultation with the Parties – will give further instructions as to the further proceedings.

## ON THE BASIS OF THE FOREGOING CONSIDERATIONS, THE FOLLOWING AWARD ON PRELIMINARY ISSUES IS RENDERED

1. The Arbitral Tribunal accepts jurisdiction in these arbitration proceedings based on Article 40 of the Contract;

2. The Arbitral Tribunal holds that only the management of FEG (with the exclusion of its receiver in insolvency) is authorized to represent Claimant;

3. The Arbitral Tribunal dismisses the claim for reimbursement of costs of legal representation and of participation in these arbitration proceedings as formulated by the receiver in insolvency;

4. The Arbitral Tribunal reserves all other decisions, including costs for the further stage of these arbitration proceedings.

Made in Paris as place of the arbitration, May 14, 2009

Mr. Gwyn Owen
Arbitrator

Prof. Philippe Leboulanger
Arbitrator

Prof. Dr. Filip De Ly
Chairman

47



International Chamber of Commerce
*The world business organization*

**International Court of Arbitration • Cour internationale d'arbitrage**

# AWARD

CERTIFIED AS A TRUE COPY OF THE ORIGINAL

..........Kigt Spalding International LLP..........

KING & SPALDING INTERNATIONAL LLP

**ICC International Court of Arbitration • Cour internationale d'arbitrage de la CCI**
38 Cours Albert 1er, 75008 Paris, France
Tel +33 (0)1 49 53 28 28  Faxes +33 (0)1 49 53 29 29 / +33 (0)1 49 53 29 33
E-mail arb@iccwbo.org  Website www.iccarbitration.org

ICC INTERNATIONAL COURT OF ARBITRATION

CASE No. 14576/CCO/JRF/GZ

FITZPATRICK EQUATORIAL GUINEA LIMITED

(Equatorial Guinea)

vs/

THE REPUBLIC OF EQUATORIAL GUINEA

(Equatorial Guinea)

This document is an original of the Final Award rendered in conformity with the Rules of Arbitration of the ICC International Court of Arbitration.

December 23, 2011

# FINAL AWARD


## ARBITRATION


### UNDER THE 1998 RULES OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE


### CASE ICC 14576/CCO/JRF/GZ


BETWEEN

FITZPATRICK EQUATORIAL GUINEA LIMITED

- CLAIMANT -


and

THE REPUBLIC OF EQUATORIAL GUINEA

- RESPONDENT -

# TABLE OF CONTENTS

List of Abbreviations

I.     Proceedings

II.    Summary of Facts

III.   Claims and Arguments of the Parties

      III.1   Claimant's Position

      III.2   Respondent's Position

IV.    Analysis of the Arbitral Tribunal

      IV.1   Attempts for an Amicable Solution as a Condition for Termination

      IV.2   Respondent's Procedural Objections

      IV.3   Law applicable to the Merits

      IV.4   Authority

      IV.5   Merits

            IV.5.1  Breach of Contract and Termination
            IV.5.2  Quantum

      IV.6   Arbitration Costs

2

## LIST OF ABBREVIATIONS

| | |
|---|---|
| Answer | Respondent's Answer to the Request for Arbitration |
| CFA | Coopération financière en Afrique central franc |
| Civil Code | Civil Code of Equatorial Guinea |
| C-X | Claimant Exhibit where X stands for the Exhibit Number |
| Claimant | Fitzpatrick Equatorial Guinea Limited |
| Contract | Contract dated February 17, 2004 |
| Engineer | SNC Lavalin Internacional Guinea Ecuatorial |
| FEG | Fitzpatrick Equatorial Guinea Ltd. |
| FIL | Fitzpatrick International Ltd. |
| ICC Court | International Court of Arbitration of the International Chamber of Commerce |
| ICC Rules | Arbitration Rules of the International Chamber of Commerce 1998 |
| Memorial | Claimant's Memorial dated September 1, 2009 |
| R-X | Respondent Exhibit where X stands for the Exhibit Number |
| Respondent | The Republic of Equatorial Guinea |
| RfA | Request for Arbitration |
| Secretariat | Secretariat of the International Court of Arbitration of the International Chamber of Commerce |

3

| | |
|---|---|
| SNC Lavalin | SNC Lavalin Internacional Guinea Ecuatorial |
| SRjRCC | Statement of Rejoinder and Reply to the Counterclaim |
| ToR | Terms of Reference |
| Tr. | Hearing Transcript |
| WS | Witness Statement |

# IN THE ARBITRATION UNDER THE 1998 RULES OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE (CASE ICC 14576/CCO/JRF/GZ)

BETWEEN:

Fitzpatrick Equatorial Guinea Ltd., a company existing under the laws of Equatorial Guinea and registered in Malabo under number 211, Malabo, Equatorial Guinea, hereinafter referred to as "FEG" or as "Claimant";

At this stage of the proceedings, Claimant is represented in this arbitration by its attorneys, Mr. Ponciano Mbomio Nvó, Cabinete Juridico Ponciano Mbomio Nvó, c/Enrique Nvó, Apartado 424, Malabo, Equatorial Guinea, Fax: +240- 09 45 23, e-mail: mbomio_ponciano@yahoo.es and Mr. Tom Sprange and Ms. Lisa Wong of the law firm Steptoe & Johnson, 99 Gresham Street, London EC2V 7NG, e-mail: tsprange@steptoe.com, Telephone +44-20-7367 8000, Facsimile: +44-20-7367 8001 and, as of May 24, 2011, of the law firm King & Spalding International LLP, 125 Old Broad Street, London EC2N 1AR, e-mail: tsprange@kslaw.com and lwong@kslaw.com, Telephone +44-20-7551 7529 and +44-20-7551 7541, Facsimile: +44-20-7551 7575

AND

The Republic of Equatorial Guinea, represented by the Minister for Infrastructure and Urban Development, rue Argelia, Malabo, Republic of Equatorial Guinea, hereinafter referred to as "Respondent".

5