Respondent was represented in this arbitration by its duly authorised attorneys, Mr. H. Page, Penlaw International Law Firm, 23 rue d'Anjou, 75008 Paris, France, e-mail h.page@penlaw.fr , Telephone: +33-1-44 51 59 70, Facsimile: +33-1-44-51 59 71 and Mr. Rasseck Bourgi, 10, rue du Chevalier de Saint-George, 75001 Paris, France, e-mail: rasseck.bourgi@wanadoo.fr , Telephone: +33-1-53 96 90 90, Facsimile: +33-1-53 96 98 98 and later by Mr. Olivier Pardo and Mr. Ludovic Landivaux of the firm Pardo Boulanger et Associés, 74 avenue de Wagram, 75017 Paris, France, e-mail: pardo@pba-avocats.com and landivaux@pba-avocats.com, Telephone +33-1-46 22 56 56, Facsimile +33-1-46 22 56 66 as well as by Mrs. Isabelle Thomas Werner, Cabinet Thomas Werner, 91, rue de l'Université, 75007 Paris, France, e-mail: i.thomas.werner@wanadoo.fr.

## THE FOLLOWING AWARD IS RENDERED

I.    Proceedings

1.    On February 17, 2004, Claimant and Respondent contracted for the construction of a motorway between the airport of Malabo and the town of Ela Nguema on the island of Bioko, Equatorial Guinea (hereinafter referred to as the "Contract") (C-1, Schedule 1 to Respondent's Memorial dated November 23, 2009) for an agreed contract sum of CFA 92,000,000,000 (or some € 140,253,000).

2.    Following a dispute arising out of the Contract, Claimant terminated the Contract on March 14, 2005 (C-87). Respondent objected to the termination of the Contract. Respondent considers that the termination was a wrongful repudiation and without justification. In April 2005, Respondent arranged for a survey to be carried out by Mr. Paul Battrick, a Chartered Quantity Surveyor, a Fellow of the Royal Institute of

6

Chartered Surveyors, a Member of the Chartered Institute of Arbitrators and a CEDR Accredited Mediator (Schedule 2 to Respondent's Memorial dated November 24, 2009).

3. The Parties have been unable to find an amicable solution to their disputes, including at a meeting called to that effect pursuant to Article 40 of the Contract on May 13, 2005 in Paris.

4. On June 9, 2006, Claimant submitted to Respondent its claim for additional moneys due under the contract, or as damages for breach of contract, asking for a reply within 60 days which allegedly was not received.

5. On September 6, 2006, Claimant filed a Request for Arbitration (hereinafter referred to as "RfA") against Respondent with the Secretariat of the International Court of Arbitration of the International Chamber of Commerce (hereinafter referred to as respectively "Secretariat" and "ICC Court"), in which it sought: (i) a monetary claim for an amount of CFA Francs 14,939,299,635- (or some € 22,774,800), being additional moneys due under the contract, or as damages for breach of contract; (ii) reimbursement of its legal costs and associated expenses of pursuing the arbitration, together with the costs and fees charged by the ICC Court and the arbitral tribunal. Claimant reserved its right to revise the quantum of its claim in the course of the arbitration, whether to take account of an increased entitlement to recover interest, or otherwise.

6. The arbitration proceedings led to an award on preliminary issues dated May 14, 2009. The contents of that award are incorporated herein so that repetition is

7

avoided. For a better comprehension of this award, however, the following may be noted: (1) Claimant appointed Mr. Gwyn Owen, Ashdale House, Higher Penley, Wrexham LL13 0NB, United Kingdom, as co-arbitrator; (2) Respondent appointed Professor Philippe Leboulanger, 5 rue de Chaillot, 75116 Paris, France, as co-arbitrator; (3) both co-arbitrators appointed Professor Filip De Ly, Johan Buziaulaan 33, 3584 ZT Utrecht, The Netherlands, as chairman; (4) the ICC Court at its session of January 19, 2007 had fixed Paris, France as the place of arbitration; (5) the language of the arbitration is English as decided by the Arbitral Tribunal, communicated to the parties on October 29, 2007 and incorporated at Section X. of the Terms of Reference signed on behalf of the Parties and by the arbitrators; (6) the Terms of Reference were executed on April 25, 2008 and (7) there was no express choice of law provision in the Contract.

7. On February 14, 2007, Respondent informed the Secretariat that it intended to file a counterclaim for a minimum of 11.1 billion CAF (or some € 16,921,800) in relation to the alleged wrongful termination of the Contract by Claimant; any such amount to be increased with additional costs related to completion of the project by different companies and delays caused.

8. By Respondent's letter dated July 24, 2007, the Arbitral Tribunal was informed that insolvency proceedings had been opened in Equatorial Guinea against Claimant and that Claimant had been declared insolvent on February 22, 2007 by a decision of the Court in Malabo, Equatorial Guinea with the appointment of Mr. Mamadou Badiane as receiver.

8

9. In its award on preliminary issues dated May 14, 2009, the Arbitral Tribunal held that it had jurisdiction with regard to the disputes between the Parties. Also, it held that only Claimant´s management and not its receiver was authorized to represent Claimant, primarily on the basis that the opening of the insolvency proceedings against Claimant had not been properly notified to Claimant.

10. After the award on preliminary issues, the Arbitral Tribunal issued directions as to the provisional procedural timetable for the remainder of the proceedings. After consultation with the Parties and deliberation, a provisional procedural timetable was issued on June 30, 2009 which was subsequently amended after consultation with the Parties on January 20, 2010, February 2, 2010 and March 5, 2010.

11. On August 5, 2009, the Tribunal was informed by Mr. Bourgi that he was no longer co-counsel for Respondent and that Mr. Page was consequently the only lawyer representing Respondent.

12. On September 1, 2009, Claimant filed its Memorial on Liability and Quantum (hereinafter referred to as "Memorial") together with Exhibits C-61 to C-88, including one witness statement.

13. On October 8, 2009, the Secretariat informed the Parties that the ICC Court at its session of that same day had increased the advance on costs from US$ 400,000 to US$ 860,000.

14. On November 4, 2009, Respondent submitted a request for production of certain documents. Having heard the Parties, the Tribunal on November 18, 2009 rejected Respondent´s requests for document production as being too broad and failing to

9

demonstrate relevance or materiality but authorized Respondent to reformulate its request.

15. On November 16, 2009, the Secretariat invited Respondent to pay its share of the balance of the advance on costs of US$ 230,000 within an additional period of ten days.

16. Respondent filed its Memorial on November 24, 2009 accompanied by Schedules 1-3. In Section B, paragraph 44 sub C of that Memorial, Respondent reformulated its request for document production to which Claimant replied on December 4, 2009.

17. Respondent having failed to pay its share of the advance on costs, the Secretariat on December 14, 2009 invited Claimant to pay Respondent's share of US$ 230,000 which Claimant did as was acknowledged by the Secretariat on December 18, 2009.

18. On December 23, 2009, Claimant filed its Reply Memorial with Exhibits C-89 to C-103 including four witness statements and one expert report.

19. On January 19, 2010, the Secretariat informed the Parties that, Claimant having made a substitute payment for Respondent failing to pay its share on the advance on costs, separate fixing of costs by virtue of Article 30 of the ICC Arbitration Rules (hereinafter referred to as "ICC Rules") was no longer possible.

20. On February 1, 2010, Mr. Olivier Pardo and Mr. Ludovic Landivaux as well as Mrs. Isabelle Thomas Werner informed the Tribunal that they had been retained to act as Counsel for Respondent along with Mr. H. Page. In that same letter, they requested

an extension of the deadline for the filing of Respondent's Rejoinder and Reply in the Counterclaim that was due the following day.

21.  Having heard Claimant's objection, the Tribunal amended the provisional procedural timetable and granted Respondent an extension until February 8, 2010 for the filing of its submission.

22.  On February 2, 2010, Respondent questioned whether Claimant was validly represented by Fitzpatrick International Limited (hereinafter referred to as "FIL") and its Counsel on the basis of a break in the chain of authority from Claimant to FIL. Claimant objected to this argument.

23.  On February 8, 2010, Respondent filed its Rejoinder and Reply to the Counterclaim with a legal opinion of Mr. Sergio Esono Abeso Tomo, a witness statement of Mr. Rafael Robustiano, a Redfern schedule and exhibits numbered 3-103c. In the Rejoinder, Respondent also requested the stay of the arbitration proceedings pending the resolution of the action for setting aside it had filed against the award on preliminary issues as well as security for costs.

24.  On February 11, 2010, Claimant opposed the stay and security applications and the disclosure requests.

25.  On February 12, 2010, Claimant objected to new claims filed by Respondent in its Rejoinder submission. On that same date, Respondent provided new arguments for its disclosure and security requests.

26. On February 16, 2010, Respondent requested further disclosure of documents from Claimant to which Claimant replied on February 17, 2010.

27. On February 17, 2010, Claimant indicated that it would address the authority issue regarding the representation of Claimant in the arbitration in its Rejoinder in the Counterclaim.

28. On February 18, 2010, Respondent again questioned the power of attorney given by Claimant to Fitzpatrick International Ltd., an affiliate company incorporated under the laws of England and Wales (hereafter referred to as "FIL") to represent it in the arbitration proceedings and on February 19, 2010 questioned the destination of the 30% advance payment at CFA 27,600,000,000 (some € 42,075,900) made by Respondent.

29. On February 23, 2010, Respondent requested that certain claims in Claimant's Memorial dated September 1, 2009 be struck out to which Claimant replied on February 25, 2010.

30. On March 2, 2010, Respondent requested answers and documents from Claimant in relation to the so-called fraudulent bond issue to which Claimant on that same date replied that it reserved its position and would revert later if needed. The advance payment bonds No 0304017 dated March 5, 2004 and No 0105030 dated January 18, 2005 as well as an invoice of Surety Guarantee Consultants Ltd dated June 10, 2004 addressed to Mr. Woodman at FIL for a premium of GBP 637,500 were attached to Respondent's message. The fraudulent bond issue relates to the question whether Claimant, its affiliates or staff were involved in a scheme under which one

12

or more advance payment bonds were issued on the letterhead of the issuer Templeton Insurance Limited without the latter's knowledge and without premiums being paid to Templeton Insurance Limited. This issue is discussed further in Section IV. of this Award.

31. On March 3, 2010, the Arbitral Tribunal issued Procedural Order No. 1 in which it *inter alia* rejected Respondent's request for a stay of the arbitral proceedings in view of Respondent's application for the setting aside of the award on preliminary issues filed with the Paris Court of Appeal. It also refused to organize a hearing for the purposes of the stay application as it considered that there is no obligation to do so for a procedural decision such as a stay of arbitral proceedings. In its decision to refuse the stay, the Tribunal took into consideration that it had not sufficiently been established on what grounds the award on preliminary issues was challenged before the Paris Court of Appeal nor that an application for setting aside by operation of French law as the law of the place of arbitration implies a mandatory stay of the arbitration proceedings. Also, the Tribunal rejected Claimant's request to strike down Respondent's new claims and defences formulated in its Statement of Rejoinder and Reply in the Counterclaim as well as Respondent's request to strike down Claimant's new claims formulated in its Memorial.

32. On March 5, 2010, the Secretariat notified the Parties that the ICC Court at its session of March 4, 2010 had reconsidered the advance on costs and increased it to US$ 1,025,000.

33. On March 9 and 10, 2010, Respondent reiterated its position as to the alleged fraudulent insurance bond and clarified that its position was that the fraud in

relation to the bond entitles Respondent to rescission of the contract and/or to return all sums paid under it, alternatively to rescission of all transactions and payments made in reliance upon the guarantee.

34. On March 10, 2010, Claimant and the three members of the Arbitral Tribunal were sued by Respondent before the President of the Paris District Court in injunctive proceedings to have the arbitrators suspend the arbitration proceedings in view of Respondent having applied for setting aside of the award on preliminary issues. Claimant but not the arbitrators have made an appearance in the injunction proceedings.

35. On March 15, 2010, Claimant filed its Statement of Rejoinder in the Counterclaim together with Exhibits C-104 to C-116 including two witness statements and an expert report.

36. On March 16, 2010, the Tribunal gave directions and asked questions as to the preparation and organization of the hearing to which Claimant replied on March 22, 2010.

37. On March 16, 2010, Respondent requested disclosure of some documents and urged the Tribunal to decide on its application for security for costs.

38. On March 17, 2010, Respondent requested further information regarding the power of attorney as to whom was to represent Claimant in the arbitration to which Claimant replied on March 22, 2010 attaching a copy of the power of attorney certified by Mr. A.J. Claudet, Notary Public in London on that same day. By virtue

14

of the power of attorney dated March 6, 2006, Claimant gave certain powers to FIL for the purposes of claims and arbitration under the Contract.

39. On March 17, 2010, Respondent through its French Counsel representing it in this arbitration filed a criminal complaint with the Public Prosecutor in Paris which was communicated to the Arbitral Tribunal on March 19, 2010. The complaint alleged that Claimant fraudulently obtained an insurance bond from Templeton Insurance Limited which entitled it under the Contract to obtain an advance payment of more than 27 billion CFA (approximately € 42 million). The complaint further alleged that Templeton Insurance Limited never issued the insurance bond nor received premiums and that another company Surety Gurantee Consultants Limited in concert with Mr. Bernard Woodman, former director of Claimant had·issued a false bond. According to the complaint, Claimant has been using a forged document to obtain the advance payment and by using forged documents in the arbitration is engaging in fraud on the award.

40. On March 18, 2010, Claimant replied to Respondent's e-mail regarding the fraudulent bond issue and denying any involvement of Claimant, its officers or employees. It relied in this respect on a letter of April 25, 2007 of Manches, the English solicitors of the defrauded party Templeton Insurance Limited which, after investigation, had concluded that no relationship between the fraud and Claimant had been established.

41. On March 18, 2010, Respondent asked further questions in relation to the fraudulent bond issue (attaching copies of the bonds) and stated that the premium for the bonds could not legally have been paid out of the advance payment. Claimant

replied on March 22, 2010 by asking questions about an alleged doctoring of the Manches March 6, 2007 letter.

42. On March 18, 2010, the Secretariat gave Respondent an additional period until April 6, 2010 to pay its share of the increased advance on costs of US$ 165,000.

43. On March 19, 2010, Respondent applied for a stay of the arbitration proceedings in light of the filing of criminal proceedings against Claimant in France in relation to an alleged fraud regarding the issuance of insurance bonds for the contract project. A copy of the complaint was attached to the application. Claimant replied to this application on March 24, 2010. Apart from the question whether the filing of a criminal complaint is a ground for an automatic stay of arbitration proceedings in France or whether the stay is at an arbitral tribunal's discretion, there also was the issue as to whether persons affiliated with Claimant and particularly Mr. Fitzpatrick might be exposed to police interrogation during their presence in France at the occasion of the hearing and whether and to what extent this might disrupt the course of the hearing.

44. On that same day, Respondent asked further questions as to the signature of Mr. Douglas Bapple, one of Claimant's directors at that time on Claimant's letters dated March 19 and March 25, 2004 attached to Respondent's communication.

45. On March 20, 2010, his Excellency the Ambassador of Respondent in France, Mr. Federico Edjo Ovono informed the Tribunal that Penlaw had been discharged of its duties and that the law firms Thomas Werner and Pardo Boulanger & Associés henceforth would represent Respondent. By letter dated March 25, 2010, his

16

Excellency the Ambassador requested the Tribunal to defer the hearing scheduled for March 29 through 31, 2010 for at least five weeks in order for Respondent's new Counsel to have more time to prepare the hearing, to have thorough investigations regarding the fraud in procuring the project's insurance bonds and to ensure equality of arms between the Parties.

46. On March 22, 2010, Claimant requested that the hearing be moved from Paris to London in view of prospects of arrest of Claimant's witnesses and party representatives travelling to France for the hearing to which Respondent objected on that same date. Claimant replied to Respondent's objection on March 23, 2010 and Respondent answered on that same day.

47. On March 23, 2010, the Arbitral Tribunal issued Procedural Order No. 2 deferring a decision as to a stay of the proceedings in relation to the criminal complaint filed with the Public Prosecutor in Paris against Claimant as Claimant had not yet replied to Respondent's request for a stay. The Tribunal also rejected Claimant's request to change the hearing venue, dated March 22, 2010.

48. On March 24, 2010, Claimant requested that some of its witnesses be examined by video link from London to which Respondent objected on the same day arguing that this would violate the Parties' equality of arms.

49. On March 24, 2010, Respondent commented on hearing organization issues and also indicated that it would present Mr. Lemieux, engineer of SNC Lavalin Internacional (hereinafter referred to as SNC Lavalin) for examination as a witness at the hearing to which Claimant objected that same day.

17

50.　On March 25, 2010, Respondent requested further information and submitted a new document which the Tribunal on that same day disregarded as not complying with its procedural instructions dated March 16, 2010 under which no new evidence could be sought and submitted.

51.　On March 25, 2010, the Arbitral Tribunal issued Procedural Order No. 3 which dealt with outstanding and hearing issues. Respondent's request dated March 19, 2010 for a stay of the arbitration proceedings in relation to the filing of a criminal complaint with the Paris Public Prosecutor was rejected. The Tribunal had reviewed the request and Claimant's reply thereto dated March 24, 2010 and after deliberation, refused to stay the arbitration proceedings as Respondent had not established that any stay is compulsory under French law. The Tribunal was of the opinion that the facts complained of in the criminal complaint were insufficiently relevant and/or material to the merits of the arbitration proceedings as to warrant a stay of the arbitration proceedings. The Arbitral Tribunal also rejected his Excellency the Ambassador's request dated March 25, 2010 to postpone the hearing for five weeks. The Arbitral Tribunal rejected this request as it did not establish new facts or elements, alternatively facts or elements that the Arbitral Tribunal could not assess at that stage of the proceedings which individually or taken together could warrant a cancellation of a hearing a few days before the start of the hearing. Respondent was in this respect instructed to address any issues it wanted to address in opening and closing submissions at the hearing. The Tribunal decided that the hearing including oral submissions would be conducted in the English language. However, Respondent's witnesses and/or experts only might be authorized to be heard in the French language if they are insufficiently capable of

18

expressing themselves in English. In accordance with the Tribunal's instructions dated March 16, 2010, Respondent had arranged the availability of an interpreter (Mr. Fields) to translate any such witness or expert testimonies from French into English. An interpreter retained by Claimant (Mr. Barber) as well as Mr. Fields would be authorized to attend during the hearing. The Tribunal also authorized testimony of Claimant's witness Mr. Fitzpatrick by video link and instructed Claimant to arrange for proper video link facilities at the time indicated in the hearing schedule reserved for Mr. Fitzpatrick's examination. The Tribunal had noted Claimant's request to hear Mr. Fitzpatrick by video link and Respondent's objection thereto dated March 24, 2010. The Tribunal considered that using modern means of communication does not raise legal objections, provides sufficient due process guarantees and does not violate the principle of "equality of arms". On the other hand, Claimant's request for the examination by video link of Mr. Suleyman was rejected as it had insufficiently been established that Mr. Suleyman was excused from attending the hearing in Paris. The Tribunal also decided to reject Claimant's request dated March 18, 2010 for an order that Respondent be precluded from pursuing allegations as to fraud involving the Claimant. Furthermore, Procedural Order No. 3 rejected Respondent's request to have Mr. Lemieux examined as a witness as no written witness statement of Mr. Lemieux had been produced at earlier stages of the proceedings and the Tribunal had decided on March 16, 2010 that no new evidence could be produced. Furthermore, Mr. Lemieux as a third party to the arbitration proceedings would not be authorized to attend the hearing. The Tribunal also ruled that no post-hearing briefs were to be filed except that the Tribunal, at the hearing or thereafter, could request submissions on specific points where it may need further information. The decision

19

on Respondent's request for security for costs dated February 8, 2010 was deferred and the Parties were requested to address this issue further during the hearing in the course of their oral opening and closing submissions. Finally, Respondent's requests for production of documents as outlined in their communications dated February 12, 19 and 23, 2010 as well as March 2, 3, 4, 5, 9, 16, 17, 18, and 19, 2010, were dismissed as being insufficiently relevant and/or material, except for the production of a letter from SNC Lavalin to Claimant dated January 27, 2005 which Claimant was ordered to produce at the latest by close of business on March 26, 2010.

52. On March 26, 2010, Claimant informed the Tribunal that Mr. Thompson was unable to travel to the hearing being retained in South Asia. On March 27, 2010, Claimant indicated that its efforts to locate a copy of the January 27, 2005 SNC Lavalin letter had been unsuccessful.

53. On March 26, 2010, his Excellency the Ambassador wrote a letter to the *Bâtonnier* of the Paris Bar in relation to the activities of Respondent's former Counsel complaining about the following facts: (1) agreeing to English as the language of the arbitration; (2) suggesting to Claimant counsel that the dispute might be submitted to ICC arbitration and failing to file setting aside proceedings earlier against the award on preliminary issues; (3) failing to properly prepare the merits stage of the arbitration; (4) failing to engage technical experts such as Mr. Battrick or Mr. Lemieux for the preparation of the merits case; (5) doctoring of the Manches letter and mishandling of the fraudulent insurance bond issue; and (6) failing to transfer a complete set of the arbitration file.

20

54. On March 28, 2010, Mr. Tackaberry Q.C. who had been retained by Respondent as advocate for the hearing, requested an adjournment of the hearing and submitted one new document. The Tribunal that same day rejected the request for an adjournment of the hearing as no new admissible fact or elements had been brought to the attention of the Tribunal and did not admit the submitted new document.

55. On that same day, Respondent requested authorization to submit a witness statement of Mr. Lemieux and one additional exhibit and requested that a person designated by it could attend the room in London where Mr. Fitzpatrick would be present during his examination by video link. The Tribunal replied that same day instructing Respondent to address the issue of production of new documents (including a new witness statement) in its opening statement at the hearing and authorizing a designate to attend Mr. Fitzpatrick's video link examination.

56. The hearing took place from March 29 to 31, 2010. A verbatim transcript of the hearing was made.

57. Claimant was represented by Mrs. Kay Williams. Respondent was represented by his Excellency the Minister of Justice Mr. Salvador Ondo Ncumu, his Excellency the Ambassador, Mrs. Bonkanka (abogado acompanante), Mr. Mariano Ucogo Eworo Avomo (Direcor General de Justicia) and Mrs. Aurora Nuebaque Torao (Secretaria Ministro Justicia).

58. Counsel for Claimant were Mr. Tom Sprange, Mr. James Brown, Mrs. Giulia Da Re, Mr. Alexis Mourre and Mr. Alexandre Vagenheim assisted by Mrs. Lisa Wong. Counsel for Respondent were Mr. John Tackaberry, Mr. David Chijner, Mrs.

21

Isabelle Thomas-Werner (assisted by Mrs. Grigorian), Mr. Olivier Prado and Mr. Ludovic Landivaux.

59. With the consent of both Parties, also letters dated January 27, 2005, February 10 and 17, 2005 were submitted at the hearing.

60. At the hearing, Respondent applied again for an adjournment of the hearing which the Tribunal dismissed.

61. The following witnesses were heard; on the part of Claimant: Mr. Pratt Snr., Mr. Cookson, Mr. Fitzpatrick (by video link), Mr. Suleyman and Mr. Foster and on the part of Respondent Mr. Tomo and Mr. Doro Esuba. The latter two witnesses were examined in French with simultaneous translation.

62. After consultation with the Parties, the Tribunal reversed its position as to not hearing Mr. Lemieux and Mr. Lemieux was examined by the Tribunal. Counsel made oral opening as well as closing submissions.

63. At the occasion of the hearing and with the permission of the Parties, the Arbitral Tribunal was informed of the decision of the President of the Paris District Court dated March 29, 2010, to decline jurisdiction over Respondent's application for an injunction to stay the arbitration pending the setting aside proceedings against the award on preliminary issues and pending the criminal prosecution in relation to the fraud in the issuance of the insurance bonds.

64. At the end of the hearing, the Tribunal discussed with the Parties some outstanding procedural issues: (1) Respondent's application for security for costs; (2) the

22

finalization of the hearing transcript; (3) the submission of costs; (4) the submission of the second page of a SNC Lavalin letter dated March 21, 2005 in the Spanish language; (5) the statement of Mr. Batterick; (6) the witness statement of Mr. Thompson; and (7) procedural objections.

65. As to Respondent's application for security for costs, the Tribunal at the end of the hearing indicated that it deferred its decision.

66. As to the hearing transcript, the Parties were instructed to submit their observations to one another within a period of two weeks and to the Tribunal within a period of one month as of the end of the hearing.

67. Similar instructions were given in relation to the cost submissions.

68. As to the SNC Lavalin letter, Respondent was instructed to submit it after the hearing as Mr. Lemieux had taken that document with him after having been examined.

69. In relation to Mr. Battrick' statement, the Parties also agreed that it could stay on the record of these proceedings and be given appropriate evidentiary weight in view of the fact that Mr. Battrick had not been examined at the hearing.

70. With regard to Mr. Thompson's witness statement, the Parties agreed that this witness statement could stay on the record of these proceedings but that in assessing the evidentiary value of the statement, account should be had that this witness had not been cross-examined.

71. As to procedural objections, Claimant indicated that it had no objections as to how the Tribunal had handled the proceedings. Respondent at the end of the hearing reserved its position as to due process prior to the hearing and as to the non-recognition of the insolvency proceedings by the Tribunal in its award on preliminary issues (Tr. Day 3, 246-248). Respondent did not address its objection as to the language of the proceedings which had caused a long recess at the start of the hearing (Tr. Day 1, 6-9) nor any other objections.

72. At the end of the hearing, the Tribunal made an inquiry with the Parties whether an amicable settlement of their disputes could still be attained. In view of the Parties' positive reactions, the Tribunal declined to assume itself a role in the settlement process but indicated that, if so desired, it could communicate some names to the Parties. The Tribunal gave the Parties a period of two months until May 31, 2010 to seek an amicable settlement.

73. The Parties have agreed on two extensions of the deadline referred to in the preceding paragraph in order to facilitate an amicable settlement. The first extension agreed upon was until June 30, 2010; the second one to August 31, 2010.

74. On March 30, 2010, the Tribunal was informed by Mr. Mamadou Badiane, the trustee in the bankruptcy proceedings over Claimant in Equatorial Guinea that for personal reasons he was resigning as trustee.

75. On April 8, 2010, Respondent communicated the original letter of SNC Lavalin in Spanish dated March 21, 2005 to the Tribunal as requested at the end of the hearing.

76. On April 12, 2010, the court reporter communicated the draft transcript as well as the corrected final transcript to the Tribunal.

77. On April 29, 2010 and on April 30, 2010, the Parties communicated their corrections to the transcript to the Tribunal.

78. On April 29, 2010, the Parties communicated their cost submissions to the Tribunal. Claimant' cost submission is for GBP 3,465,956.83 and € 124,050.01 for the period 2005-2010. Respondent's costs submission, as of the start of the arbitration proceedings, is at GBP 75,000 and € 641,493.35. On that same date as well as on May 12, 2011, Claimant made some additional comments on Respondent's costs submission and on its own. Respondent commented on Claimant's costs submission as well as on its own on May 9 and May 31, 2010.

79. On May 7, 2010, Respondent filed an appeal with the Paris Court of Appeal against the order of the President of the Paris District Court dated March 29, 2010 rejecting Respondent's application for an injunction against the members of the Arbitral Tribunal to stay the arbitration proceedings pending Respondent's application for a setting aside of the award on preliminary issues. The members of the Arbitral Tribunal have not made an appearance in these appeal proceedings. They have not been informed by the Parties or by the Court of Appeal as to the progress or outcome (if any) of these appeal proceedings.

80. On July 12, 2010, the Secretariat requested Respondent to pay its share of the increased advance on costs at US$ 165,000 within an additional period of ten days.

81.   On July 27, 2010, Claimant requested that separate advances on costs in relation to the claim and the counterclaim be fixed by the ICC Court.

82.   On August 4, 2010, Respondent informed the Tribunal that Mr. Battrick, who had not been examined at the hearing, had prepared a report on liability and quantum in connection with the mediation process and submitted Mr. Battrick's Final Report which was opposed by Claimant on August 11, 2010. However, Claimant acknowledged that the Tribunal retained discretion to admit additional evidence after a substantive hearing. By letter dated August 23, 2010, Respondent explained the reasons for the late filing of the Final Battrick Report and the fact that Mr. Battrick for family reasons could not attend the hearing. The evidentiary weight of the Battrick Final Report will be discussed in Section IV. of this award.

83.   In that same August 4, 2010 communication, Respondent informed the Tribunal that the criminal complaint was still pending.

84.   On August 6, 2010, the Secretariat informed the Parties that if the increased advance on costs at US$ 165,000 were not paid by Respondent within an additional period of fifteen days, the ICC Court at its session of August 5, 2010, had decided to fix separate advances of costs at US$ 865,000 for Claimant and at US$ 700,000 for Respondent. On the basis of US$ 660,000 already paid by Claimant and of US$ 200,000 paid by Respondent, the balance due would be US$ 205,000 for Claimant and US$ 500,000 for Respondent.

85.   On August 25, 2010, the Arbitral Tribunal wrote to the Parties expressing its understanding on the basis of their communications dated August 23 and 24, 2010

that no amicable settlement could be achieved and that it would proceed on that basis unless advised otherwise.

86. On August 25, 2010, the Secretariat informed the Parties that the Parties having failed to make the outstanding payments for the advances on costs, separate advances on costs were due by virtue of the ICC Court's decision dated August 5, 2010 and invited Claimant to pay US$ 205,000 and Respondent US$ 500,000.

87. On August 27, 2010, Respondent requested the ICC Court to reconsider its decision to set separate advances on costs to which Claimant objected by letter dated September 3, 2010.

88. On September 15, 2010, Respondent filed a further submission and six exhibits and commented on these in a further communication dated September 22, 2010. Claimant objected to these on September 23, 2010. The Tribunal has not rejected this submission and these exhibits. Their evidentiary weight will be discussed in Section IV. of this Award.

89. On September 21, 2010, the Secretariat acknowledged receipt of the additional payment of US$ 205,000 for advance on costs made by Claimant and gave Respondent an additional period of fifteen days to pay its balance of the separate advance on costs at US$ 500,000.

90. On October 21, 2010, the Secretariat granted Respondent an additional period of ten days to pay its balance of the separate advance on costs at US$ 500,000.

27

91. On November 3, 2010, the Secretary-General of the ICC Court granted Respondent an additional period of fifteen days to pay its balance of the separate advance on costs at US$ 500,000. Respondent's attention was also drawn to Article 30 (4) ICC Rules under which the counterclaims shall be considered withdrawn – without prejudice to their introduction at a later date in another proceeding – on the expiry of the period granted to make the advance on costs. The Secretary-General also informed the Parties that the Arbitral Tribunal had been invited to suspend its work.

92. On November 25, 2010, the Secretariat informed the Parties that, failing payment of Respondent's balance of the separate advance on costs and in the absence of an objection to the application of Article 30 (4) ICC Rules, the counterclaims were considered withdrawn as of the expiry of the additional payment period (i.e., on November 18, 2010).

93. On April 15, 2011, Claimant informed the Tribunal that the Paris Court of Appeal by decision dated April 7, 2011 had dismissed Respondent's application to have the award on preliminary issues set aside.

94. On May 24, 2011, Claimant's Counsels Mr. Tom Sprange and Ms. Lisa Wong informed the Tribunal that they had moved to the law firm of King & Spalding International LLP.

95. On May 27, 2011, Mr. Mamadou Badiane, the trustee in Claimant's bankruptcy in Equatorial Guinea sent an e-mail to the Tribunal attaching a decision of the Paris District Court of April 28, 2011 recognizing the bankruptcy order of the Malabo District Court of February 22, 2007. The trustee also requested the Tribunal to send

any document regarding the arbitration to him as the legal representative of Claimant. As the Tribunal in its award on preliminary issues had refused standing to the trustee, it did not implicate the trustee in the merits stage of the proceedings. Also, the Tribunal could not reconcile Mr. Badiane's message with his previous one informing the Tribunal that he was to resign.

96. On May 28, 2011, Respondent communicated a recognition decision of the Paris District Court dated April 28, 2011 in which the insolvency proceedings over FEG in Equatorial Guinea were recognized.

97. From the text of the decision, it appears that the Paris District Court proceedings were initiated on August 6, 2010 by Respondent represented by Mr. Olivier Prado who also represented Respondent in this arbitration against Mr. Badiane in his capacity of trustee of Claimant's bankruptcy to have the bankruptcy order of the Malabo District Court of February 22, 2007 declared enforceable in France. The Paris District Court granted the request and declared the Malabo order enforceable in France.

98. On July 1, 2011, Claimant requested the Tribunal that, if money damages were payable to it under the award, such award should specify that payment be made only to a designated trustee client account of its Counsel held with Barclays Bank in the United Kingdom.

99. On July 11, 2011, Respondent objected to Claimant's request that monies payable under an award be paid into a client account with Claimant's Counsel.

100. On July 19, 2011, Claimant replied to Respondent's July 11, 2011 letter to which Respondent answered on July 22, 2011 including a request to order the Claimant to forward all the items and documents (in particular, the articles of association and minutes of meetings, the extract from the trade and companies register, shareholders' agreements, etc.) that are likely to clearly establish the capital distribution of Claimant.

101. In its letter dated July 11, 2011, Claimant also addressed the enforcement order of the Paris District Court.

102. By letters dated January 6, 2010, April 2, 2010, June 24, 2010, September 30, 2010, December 29, 2010, April 19, 2011, July 7, 2011, August 1, 2011, August 19, 2011, September 20, 2011, October 20, 2011,November 21, 2011 and December 20, 2011, the Secretariat informed the Tribunal that the ICC Court – pursuant to Article 24 (2) ICC Rules – at its respective sessions of December 3, 2009, March 4, 2010, June 3, 2010, September 2, 2010, December 2, 2010, April 7, 2011, July 7, 2011, August 4, 2011, September 1, 2011, October 6, 2011, November 10, 2011 and December 8, 2011 had extended the time limit for rendering the Award until respectively March 31, 2010, June 30, 2010, September 30, 2010, December 31, 2010, April 30, 2011, July 31, 2011, August 31, 2011, September 30, 2011, October 31, 2011, November 30, 2011, December 31, 2011 and January 31, 2012.

103. On December 6, 2011, the Arbitral Tribunal having concluded its deliberations considered that it had all the information required to proceed to an award and notified the closure of the proceedings by virtue of Article 22 ICC Rules to the

Parties. In view of its deliberations and the outcome of these proceedings, Respondent's application for security for costs has become moot.

II.   Summary of Facts

104.   This section summarizes the relevant facts on which the parties are in agreement or which have sufficiently been proven and/or insufficiently been contested by either party. They relate to the merits of the dispute and not to the preliminary issues which were the subject of the first stage of these proceedings leading to the award on preliminary issues dated May 14, 2009.

105.   On February 17, 2004, Claimant and Respondent contracted for the construction of a motorway between the airport of Malabo and the town of Ela Nguema on the island of Bioko, Equatorial Guinea. Claimant was in this respect incorporated as a special purpose company under the laws of Equatorial Guinea to perform the Contract; 75% of its shares are owned by Fitzpatrick Gibraltar Limited and 25% by Comatrading, a company incorporated under the laws of Equatorial Guinea (attachments to Claimant's e-mail dated March 30, 2010).

106.   By the end of 2004, the relationship between the Parties deteriorated. There was a dispute regarding the guarantee to be provided under the Contract to secure the repayment of a substantial CFA 27,600,000,000 advance payment made by Respondent. Respondent apparently had lost the guarantee and requested a new guarantee, Claimant had a new guarantee issued which – like the previous one – was issued by an insurance company and was a conditional bond payable upon

31

presentation of a judicial decision under the underlying Contract and not on demand. Respondent required an on demand bank guarantee which it did not get. In the same period, three monthly applications for payment were issued by Claimant, there were disputes with Respondent and the Engineer SNC Lavalin as to the certification by SNC Lavalin of the monthly payment requests and no payments were made. Respondent also considered that Claimant was behind the project's time schedule while Claimant took the position that there was a slight delay but that this was the result of actions by Respondent in relation to not providing a suitable site compound area, not making timely progress payments, its Engineer wrongly rejecting Claimant's design and Respondent interfering with Claimant's work as to where to start the construction work.

107. The Parties were in a deadlock and both threatened to terminate the Contract. Ultimately, Claimant terminated the Contract on March 14, 2005 for non-payment of its monthly applications for progress payments while at the same time suggesting to conclude a new contract on different terms.

108. Respondent objected to the termination of the Contract. Respondent considered that the termination was a wrongful repudiation and without justification. In April 2005, Respondent arranged for a survey to be carried out by Mr. Paul Battrick.

109. The Parties have been unable to find an amicable solution to their disputes.

110. Claimant is represented by FIL under a Power of Attorney and a Service Agreement both dated March 8, 2006 authorizing FIL to represent the interests of FEG.

32

111. The Parties have requested the Arbitral Tribunal to take into account the broader ramification of their disputes when assessing the merits. Claimant alleges that Respondent has engaged in improper actions following the termination of the Contract including conservatory seizure of FEG's plant, equipment and property, placement of its staff under house-arrest, confiscation of passports of its expatriate staff preventing it to leave the country, debarring of its local counsel and a sham insolvency proceeding against FEG. FEG has also accused Respondent of not observing separation of powers between its executive and judicial branches of government, non-observance of the rule of law and corruption. The Arbitral Tribunal understands these accusations as indications that Respondent allegedly did not accept the termination of the Contract and took whatever possible action to seize the assets of FEG and to avoid its liabilities under the Contract.

112. Respondent has denied the allegations above. In its opinion, Claimant repudiated the Contract and left Respondent with no choice but to seek conservatory measures to protect its interests. Moreover, Respondent alleges that FEG's management left the site and the country without paying employees, contractors and social security contributions and, thus, causing social unrest. For that reason, Respondent had to pay these claims and was, thus, authorized to have the bankruptcy proceedings over Claimant instituted. Respondent has also emphasized that Claimant – after the conclusion of the Contract – cashed a substantial advance payment of 30% of the Contract price, provided fraudulent insurance bonds and then terminated the Contract on a false pretext to retain the advance payments which by far exceeded the value of the works performed under the Contract until termination date.

113. By judgment dated February 22, 2007, the District Court of Malabo, Equatorial Guinea (*Tribunal de Première Instance*) has pronounced the insolvency of FEG (*liquidation des biens*). The insolvency order drafted in the French language was communicated to the Arbitral Tribunal during the first stage of these proceedings (see Award on Preliminary Issues par. 66).

114. The insolvency order indicates that the insolvency proceedings were instituted at the initiative of the Public Prosecutor of the Republic of Equatorial Guinea dated December 8, 2006 ("*Sur saisine de Monsieur le Procureur de la République de Guinée Equatoriale aux fins de liquidation des biens de la société FITPATIRCK EQUATORIALE GUINEA LTD.*") and that on January 16, 2007, the request of the Public Prosecutor was declared admissible. In its award on preliminary issues, the Tribunal has not recognized the insolvency order and the standing of the trustee in these proceedings as the institution of the bankruptcy proceedings were not properly notified to Claimant.

III.     <u>Claims and Arguments of the Parties</u>

115. This section sets forth the claims and arguments of the Parties on the merits. As the counterclaims are considered withdrawn for the purposes of these proceedings by virtue of Article 30 (4) ICC Rules, no reference is to be made to the counterclaims and to the parties' arguments in relation thereto.

III.1    Claimant's Position

116.    Claimant alleges that Respondent is in breach of its obligations under the Contract and that it was entitled to terminate the Contract. In relation thereto, Claimant in the Request for Arbitration had the following prayers for relief: (i) a monetary claim for an amount of CFA Francs 14,939,299,635-, being additional moneys due under the contract, or as damages for breach of contract; (ii) reimbursement of its legal costs and associated expenses of pursuing the arbitration, together with the costs and fees charged by the International Chamber of Commerce and the arbitral tribunal. Claimant reserved its right to revise the quantum of its claim in the course of the arbitration, whether to take account of an increased entitlement to recover interest, or otherwise.

117.    In its Memorial dated September 1, 2009, the prayers for relief were amended to the following effect:

> "217.1 A declaration that the Respondent is in breach of Article 33(a) of the Contract and also the Civil Code by failing to properly administer the Contract;
>
> 217.2 A declaration that the Respondent is in breach of the Civil Code and Articles 6 and 33(a) of the Contract by failing to make payments in accordance with Certificates issued by the Engineer;
>
> 217.3 A declaration that the Respondent is in breach of the Contract and the Civil Code by failing to provide appropriate land for logistical purposes, to

35

ensure that roads used by the Claimant were in good condition and to enter into a further arrangement in respect of additional work

217.4 A declaration that the Claimant validly and legitimately terminated the contract pursuant to the terms thereof and/or the Civil Code and is entitled to compensation from the Respondent for the losses suffered as a result of that termination, the breaches of the Contract and Civil Code and the actions taken in response by the Respondent.

217.5 A declaration that the Claimant is entitled to an indemnity from the Respondent in respect of third party liabilities incurred by the Claimant as a result of the Respondent's breaches and the termination of the Contract.

217.6 Compensation in the sum of €259,801,040.5648 or such other sum as the Tribunal may consider appropriate for losses suffered comprising[1]:

217.6.1 Lost profit/margin as a result of termination: €40,329,578.50

217.6.2 The entitlement which the Claimant had to additional payments prior to termination: €11,027,923

217.6.3 The costs and liabilities incurred by the Claimant as a result of premature termination (excluding unquantified liabilities to third parties): €400,865

217.6.4 The loss of the opportunity to make the profit which the Claimant would have made (excluding losses by other Fitzpatrick Group companies) under other contracts had its assets not been expropriated and its business destroyed by the Respondent's breaches: €83,737,375.90

---

[1] "This does not include allowances for lost opportunities outside Equatorial Guinea nor unquantified liabilities to third parties or losses arising from the expropriation of the quarry."

> *217.6.5 The residual value of the Claimant's assets (including plant and the quarry): €15,157,224*
>
> *217.6.6 Interest pursuant to Article 35 of the Contract or in the alternative at commercial rates on any and all sums found due and owing: €109,148,074.16 and continuing*
>
> *217.7 The Respondent should pay the Claimant's costs and expenses on an indemnity basis, including but not limited to its legal and expert fees, arising out of, or in connection with, this arbitration and a payment of monies to cover such costs and expenses. Details of such costs will be submitted shortly before any final award is to be made.*
>
> *217.8 The Respondent should pay the arbitration costs and the fees and expenses of the Arbitral Tribunal and the ICC."*

118. On July 1, 2011, Claimant amended its prayers for relief to the effect that amounts payable under the award (if any) be paid into a client account of its counsel. The precise wording of that amendment is as follows:

> *"It is hereby ordered that any and all amounts awarded to the Claimant under this award be paid to the following account:*

| | |
|---|---|
| *Bank Name:* | *Barclays Bank Plc* |
| *Account Name:* | *King & Spalding International LLP* |
| | *General Client EUR Account* |
| *Sort-Code:* | *20-77-67* |
| *Account Number:* | *63833766* |

|  |  |
|---|---|
| *SWIFT Code:* | *BARCGB22* |
| *IBAN Number:* | *GB10 BARC 2077 6763 8337 66* |
| *Reference:* | *TKS/LW/17587.263001."* |

119.   In support of its claims, Claimant argues that, under the Contract, it was entitled to progress payments and that it met all the formal and substantive requirements in relation thereto. As progress payments were not forthcoming as they ought to, Claimant is of the opinion that it faced a cash flow problem and was exhausting the advance payments and had to terminate the Contract to avoid a negative cash flow position and to preserve its financial position.

120.   Claimant has vigorously denied all Respondent's arguments and defences in relation to both the arbitral proceedings and the merits including the representation issue, the fraudulent bond issue, the formal and substantive requirements regarding the progress payments and quantum issues. To avoid repetition, these will be discussed at greater length in Section IV. of this Award.

III.2   Respondent's Position

121.   Respondent has reserved its position as to the Award on Preliminary Issues and in relation to some issues regarding the way the Tribunal has handled the merits stage of the proceedings.

122.   It has taken the position that Claimant was not entitled to terminate the Contract as Respondent was not in breach and that the claims are to be dismissed. In that respect, Respondent has developed the following reasoning.

123. Respondent has disputed that Claimant was entitled to terminate the Contract. In this respect, Respondent has submitted an interim report prepared by Mr. Paul R. Battrick. It also filed counterclaims – now withdrawn by virtue of Article 30 (4) ICC Rules for failing to pay separate advance on costs of the arbitration – in relation to fraud in the formation of the Contract, the alleged wrongful termination of the Contract by Claimant including additional costs related to completion of the project by different companies and delays.

124. Respondent considers that Claimant cashed a substantial advance payment and terminated the Contract to retain part of the advance payment while not meeting the milestones under the Contract for completion and, thus, not receiving the progress payments. Respondent has argued that Claimant did not meet the formal and substantive contractual requirements regarding the progress payments and was, thus, not entitled to these payments. Consequently, Claimant had no right to terminate the Contract and its termination constitutes a wrongful repudiation.

125. Respondent has, further, developed arguments as to the following issues: the representation of Claimant by its affiliate FIL; the issuance of fraudulent advance payment bonds, which was a condition for the payment of a substantial advance payment, and quantum issues. To avoid repetition, these arguments will be discussed in Section IV. below of this Award.

126. On the basis of its arguments, Respondent has requested the Arbitral Tribunal to dismiss all claims and to order Claimant to pay all costs of the proceedings,

including legal costs and costs of the ICC and travel and attendance of witnesses (SRjRCC par. 133).

## IV.   Analysis of the Arbitral Tribunal

127.  Before embarking upon an analysis of the merits, the Arbitral Tribunal will discuss the following issues: 1) attempts to reach an amicable solution as a condition for termination; 2) the procedural objections that Respondent has maintained at the end of the hearing; 3) the law applicable to the merits and 4) the representation of Claimant by FIL.

128.  As the counterclaims have been withdrawn for the purposes of this arbitration, the Tribunal does not need to discuss the basis of these counterclaims (*i.e.*, whether Respondent was fraudulently induced to conclude the contract by Claimant misrepresenting that it was part of the Fitzpatrick group while Fitzpatrick Plc was in the process of being sold to VolkerWessels). Thus, the counterclaim at CFA 27,600,000,000 (€ 42,075,900) for restitution of monies already paid needs not be addressed.

129.  The Tribunal also does not need to address the costs that Respondent made to finalize the highway project which were estimated at CFA 88,252,798,562 (€ 134,541,000) as also this counterclaim is deemed withdrawn.

### IV.1 Attempts for an Amicable Solution as a Condition for Termination

130. Respondent has argued that Article 40 of the Contract requires that parties first meet to seek an amicable settlement before a party can terminate the Contract. As Claimant did not seek such an amicable solution, it was not entitled to terminate the Contract. Claimant, on the other hand, indicates that Article 40 cannot be interpreted in the way proposed by Respondent and has, furthermore, emphasized that the Parties have met regularly to discuss and solve the problems that had arisen in relation to the guarantee, the progress of the works, the certificates of the engineer and the interim payments.

131. Article 40 of the Contract reads as follows:

> "*Article 40. – DISPUTES*
>
> *In the event of any disputes, the parties shall meet in order to reach an amicable solution. Otherwise they shall submit any disputes to the Court of Equatorial Guinea or, as a last resort, the matter shall be resolved according to the arbitration procedure for the International Chamber of Commerce.*"

132. As Article 40 is clearly a dispute resolution clause, the obligation to meet and attempt an amicable solution is – in the opinion of the Arbitral Tribunal – not a precondition to termination of a contract or to the exercise of whatever contractual remedy but an obligation prior to starting any dispute settlement mechanism. Respondent's argument that Claimant by virtue of Article 40 was pre-empted to terminate the Contract is, thus, to be dismissed. Moreover, there were indeed many

41

meetings between the Parties to discuss and solve the problems, to break the deadlock and to try an amicable solution to avoid judicial proceedings.

133. At this point, it can also be noted that the Parties met in Paris on May 13, 2005 to reach an amicable solution (C-89, WS Mr. Fitzpatrick par. 89 and 99). However, this attempt failed leading to Claimant starting the present arbitration proceedings.

## IV.2    Respondent's Procedural Objections

134. At the end of the hearing, Respondent – as it was entitled to do – indicated that it had appeared before the Tribunal under protest and that it reserved its position as to due process and the non-recognition by the Arbitral Tribunal of the insolvency proceedings in Equatorial Guinea implying that they objected to the management of Claimant and not its trustee being involved at the merits stage of this arbitration.

135. The Tribunal interprets Respondent's position to be that it did not accept the award on preliminary issues both as to jurisdiction and as to the standing of the management of Claimant to represent it during the merits stage.

136. There is nothing that the Tribunal ought to say as to Respondent's reservation of rights in relation to the award on preliminary issues. The Tribunal should not become a judge of its own cause defending its award which is subject to challenge proceedings before the French courts. Under French law as the law of the seat of the arbitration as the Tribunal understands it, Respondent is without conditions entitled to apply for setting aside to have the award on preliminary issues reviewed

42

by the Paris Court of Appeal and subsequently by the French Supreme Court on the basis of the grounds for challenging awards available under French law. This is what Respondent has done and there is nothing to be added to that observation. The review of the award is in the hand of the French courts and this fact is to be acknowledged and respected by this Arbitral Tribunal. Consequently, the Tribunal also cannot express any opinion as to the refusal of the Paris Court of Appeal in its judgment dated April 7, 2011 to set aside the award on preliminary issues.

137. The question as to whether the arbitration proceedings should have been stayed by the Tribunal when informed of Respondent filing for setting aside with the Paris Court of Appeal is, however, a different question. First, the Arbitral Tribunal has not been injuncted to stay the arbitration proceedings by a French court: the President of the Paris District Court on March 29, 2010 rejected Respondent's application for an injunction and the Arbitral Tribunal has not been informed about the outcome of an appeal filed on May 7, 2010 against the March 29, 2010 order. Second, the Tribunal in its Procedural Order No. 1 did not refuse Respondent's stay application because of its assessment of the merits of Respondent's setting aside application but because Respondent had not sufficiently demonstrated on what grounds it had filed for setting aside and that a stay under French law is mandatory. Thus, the Tribunal lacked relevant information to assess whether in using its discretion a stay order was appropriate given that a stay would imply that the merits stage of the arbitration could not continue for another two to three years and that the merits stage was already advanced at the time of the stay application to the moment where four submissions had already been filed, only Claimant's Rejoinder in the Counterclaim was due and a hearing was scheduled some eight weeks after

43

the stay application. To the extent that Respondent reserved its position as to the Tribunal's dismissal of its stay application, the Tribunal for the reasons above does not consider that Respondent's due process rights have been violated.

138. The provisional conclusion above in the opinion of the Tribunal is unaltered by the fact that Respondent first appointed new counsels to act with its existing counsel and then changed counsel. In general, changing counsel during proceedings comes at the risk of a party doing so. The Tribunal has not been convinced that there were special circumstances warranting to amend the provisional procedural timetable to give new counsel more time to prepare for the hearing. Both Respondent's Defence Memorial and Rejoinder and Reply to the Counterclaim had been filed at the time Counsel were changed and Respondent primarily had one major task left and that was to prepare for the hearing. Moreover, new Counsel had already been retained by Respondent on February 1, 2010 and had some two months to prepare for the hearing. In this respect, Respondent's e-mail dated May 9, 2010 as to costs indicates that it considers that – referring to the hearing and pre-hearing work of new counsel – fees at € 250,000 were not excessive for four lawyers, an American paralegal and an intern working for a complete month. Under those circumstances, the Tribunal considers that Respondent's due process rights were not affected and that the Tribunal was entitled to refuse the stay application and that no further action was or is required.

139. Also this provisional conclusion remains unaltered by the reproaches that Respondent has made against its former Counsel. Generally, a party is bound by the procedural actions of its former counsel and criticisms regarding the quality of

44

work or strategic choices will not in itself be a ground to change a procedural timetable or the management of a case. The fact that Respondent with new Counsels may have handled the case differently from the outset is not a reason to upset the arbitration proceedings where the provisional procedural timetable defined the different steps of the proceedings with their respective deadlines or dates. The Tribunal considers that Respondent has had a full opportunity to present its case during the merits stage; it submitted two memorials and many letters as to procedural issues, it was heard at a three day hearing in oral opening and closing submissions, its witnesses were heard and it cross-examined Claimant's witnesses. The Tribunal considers that it was sufficiently informed by Respondent's submissions in writing and by the very capable pleading of its case during the hearing so that it could proceed to an award.

140. In making reproaches to its former Counsel, Respondent has referred to a letter of the English law firm Manches dated March 6, 2007 in relation to the alleged fraudulent issuance of the insurance bonds where former Counsel would have doctored that letter by deleting the date of the letter on both the first and second page, by deleting the date and time references in the fax header and by deleting a reference to an earlier January 8, 2007 letter in the first paragraph of the letter, thus suggesting that it would be a recent letter. Claimant discovered this issue and the matter was rectified so that in any event the Tribunal was not misled as to the date of the letter. The Tribunal has not heard former Counsel in relation to this incident. The only thing the Tribunal can say is that fortunately this issue was noticed and the Tribunal was not misled. However, the Tribunal fails to see how this incident impacted Respondent's due process rights. Respondent could also address the

45