incident and – since the letter with the correct dates was already on file during the first stage of the arbitration – the likelihood that the Tribunal be misled was remote. Moreover, the credibility of Respondent's case was not affected as the Tribunal cannot draw any inferences from procedural conduct by former Counsel without having him examined.

141. To the extent that Respondent has formulated other reproaches against its former Counsel, the Tribunal has not seen a substantiation of any such reproaches and is unable to form any views on them. Thus, any such reproaches have not impacted Respondent's due process or other procedural rights.

142. The Tribunal also fails to see how this would be different in relation to the criminal complaint filed against Claimant and Respondent's request to stay the proceedings pending the criminal case. In the Tribunal's opinion, the dismissal of that stay application did not affect Respondent's due process rights. Respondent could still take whatever action in the arbitration, make arguments regarding the alleged fraud and draw the Tribunal's attention to whatever facts or issues arising out of the alleged fraud. Moreover, the Tribunal has not seen a beginning of evidence that Claimant or any of its officers or employees were involved in fraudulently procuring insurance bonds. Claimant in its letter dated March 18, 2010 has substantially refuted Respondent's allegations regarding the insurance bonds which put Respondent in the position to prove these allegations. Respondent has not given any substantial response to Claimant's reasoned objections. In this respect, the letter dated April 25, 2007 of the English law firm Manches that was instructed by the defrauded insurance company Templeton Insurance Limited to investigate the

fraud, confirmed that Manches, after an investigation, had not found any relationship between the fraud and Claimant. For these reasons, the Tribunal considers that it was and is entitled not to take action such as a stay of the proceedings pending a criminal investigation without infringing upon Respondent's due process rights.

143. The Arbitral Tribunal has not been informed about other alleged criminal activity of Claimant and cannot speculate about the precise contents of Respondent's criminal complaint with the Paris Public Prosecutor. If there were any such other relevant facts, Respondent ought to have brought them to the attention of the Tribunal so that it could dispose of any issues arisen from them.

144. No other procedural objections having been raised or maintained by either Party, the Tribunal considers that any such objections have been waived.

145. On the basis of the above, the Tribunal comes to the conclusion that the procedural objections raised by Respondent as regards a violation of its due process rights are unfounded and do not need remedial action. As to Respondent's objection as to the award on preliminary issues, this has been dealt with by the Paris Court of Appeal and may in due course be dealt with by the French Supreme Court.

IV.3 <u>Law applicable to the Merits</u>

146. The Contract does not contain an applicable law clause. The Terms of Reference in these proceedings provide as follows:

47

> *"By virtue of Article 17 (1) of the ICC Arbitration Rules, the parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate. Respondent considers that the law of Equatorial Guinea (including the OHADA law) is the most appropriate, given that it is the national law common to the parties and the law of the place of performance."*

147. From the above, it follows that the Parties have not agreed on the law applicable to the merits either in the Contract or at the time of the execution of the Terms of Reference in these proceedings. Also during the proceedings in relation to the preliminary issues and during the merits stage up to today, the Parties have not agreed on the law applicable to the merits of their disputes. Claimant in its Memorial dated September 1, 2009, has suggested that the Tribunal be guided by the laws of Equatorial Guinea (par. 34); Respondent has not clearly expressed itself as to the applicable law but has brought forward expert witnesses on the laws of Equatorial Guinea. The Tribunal will revert later in this Award to issues regarding applicable law if and to the extent the applicable law is necessary for the determination of any issue. However, as a preliminary observation, the following may be noted.

148. First, account is to be had of Article 17 of the ICC Rules as also confirmed in the Terms of Reference. In accordance with Article 17 of these Rules, absent a choice of law provision in the Contract, the Arbitral Tribunal is in all cases to take account

48

of the provisions of the contract and, otherwise, is to apply the rules of law which it considers appropriate. The Tribunal will, thus, primarily be guided by the provisions of the Contract and, absent a contractual provision, will apply – if and to the extent required – the rules of law which it considers appropriate.

IV.4    Authority

149.    Respondent has challenged FIL's authority to represent Claimant in these arbitration proceedings. It has requested documents to that effect from Claimant. Claimant has provided some documents and indicated that there was a valid power of attorney from Claimant to FIL to represent it in these proceedings.

150.    C-113 is a copy of the Power of Attorney signed by directors of Claimant to its affiliate FIL. C-112 is the Board Minute of Claimant's meeting deciding on the representation. On the basis of these documents which prove FIL's authority, the Tribunal considers that Claimant is validly represented in these arbitration proceedings by FIL.

151.    The Tribunal also rejects Respondent's allegation first developed in its oral closing submission (Tr. Day 3, 669) that the representation of Claimant by FIL is null and void as being a *pactum de quota litis*. Claimant has been transparent as to who was funding its costs in the arbitration; moreover the third party funder is an affiliate or related company and the Tribunal under those circumstances does not consider that any such representation offends notions of international public policy at the place of arbitration.

## IV.5    Merits

152.   After a discussion of the issues above, the Arbitral Tribunal now turns to its analysis of the merits. As follows from Section III. above, there are two main issues on which the Parties are divided. The first issue is whether Respondent was in breach of contract on March 14, 2005 and whether Claimant was entitled to terminate the Contract on that day for breach. The second issue is whether and to what extent Claimant is entitled to damages for breach of contract. These two main issues will be discussed below.

### IV.5.1   Breach of Contract and Termination

153.   Claimant has stated that the progress payments were not timely paid entitling it to terminate the Contract on March 14, 2005. It asserts that it issued payment requests and that, under the Contract, they were payable within a period of sixty days. Complying with all requirements under the Contract and the invoices not being paid within the said period notwithstanding its efforts to convince Respondent to make timely payments, it was forced to terminate the Contract to limit its future exposure.

154.   Respondent has raised a number of defences in relation to the claims. First, Respondent claims that Claimant was in breach because (1) no bank guarantee as provided in an agreement dated January 11, 2005 (C-3/156-158, C-107) was provided but only an insurance bond; and (2) the insurance bond also was not of an unconditional on demand nature but required a judicial decision before it could be

50

called. Claimant has replied that (1) the January 11, 2005 document required a guarantee from a bank or leading insurance company; (2) Respondent had already waived a bank guarantee by accepting the earlier March 4, 2004 insurance bond; (3) the guarantee was a condition to the payment of the advance but not to that of the progress payments.

155. As to the insurance bond, the Tribunal agrees with Claimant. Respondent accepted the March 4, 2004 insurance advance payment bond – although under Article 8 of the Contract an irrevocable, unconditional and at first request payable bank guarantee issued by a leading internationally recognised bank was required – and the advance payment was subsequently released. Having made a substantial advance payment of CFA 27,600,000,000 without first having received an on demand bank guarantee as required by Article 8 of the Contract, Respondent must be deemed to have waived the requirement for a bank guarantee and to have accepted an insurance bond. The record also does not indicate that Respondent in the period end March 2004 until the end of 2004 challenged the issuance of the insurance bond.

156. Respondent's arguments (Memorial paragraphs 6-7) as to the differences between the contractually required bank guarantee and the insurance bond issues in terms of the duration of the bond (three years to ensure repayment of the advance payment under Article 8 of the Contract versus one year under the insurance bond provided) and the nature of the guarantee (an on demand guarantee under Article 8 of the Contract versus a bond conditioned upon a joint certificate issued by the Parties or a judicial decision) – in the opinion of the Arbitral Tribunal – do not change the

analysis as the March 4, 2004 insurance guarantee accepted by Respondent also did not meet the contractual requirements of Article 8 in terms of duration and nature as discussed above and, consequently, these had been waived by Respondent when it made an unconditional payment of the advance payment.

157.   As Respondent had lost the 2004 bond, it requested a substitute bond which was issued on January 20, 2005. However, the substitute bond was only callable upon receipt of the first interim monthly payment. The January 11, 2005 document did not require a bank guarantee but also authorized the issuance of a guarantee from a leading insurance company. Thus, Claimant complied with its obligations to issue a guarantee to cover the advance payment and was not in breach itself under the Contract when it terminated the Contract on March 14, 2005.

158.   The above is unaltered by the fact that a fraud was committed in relation to the insurance bond. Claimant has argued that neither it nor any of its officers or employees were involved in such fraud but that the fraud was related to the insurance intermediary Surety Guarantee Consultants Ltd. with the assistance of an employee of the insurance company Templeton Insurance Limited. Respondent has made enquiries into the fraud and requested production of documents in relation thereto but has not succeeded in establishing that Claimant, companies related to Claimant, their officers or employees were involved in the fraud. Furthermore, the law firm Manches investigating the fraud for Templeton Insurance Limited concluded that no such relationship existed. The criminal complaint with the Public Prosecutor in Paris was a further exercise by Respondent to seek evidence establishing the relationship between Claimant and the fraud but the evidence

available to the Tribunal on the basis of the documents submitted by the Parties and their submission in relation thereto did not provide anything for the Tribunal to adapt the proceedings for Respondent to be able to collect more evidence or to stay the proceedings pending a criminal investigation. As nothing has been proven in relation to Claimant's involvement in a fraud regarding the insurance bonds, there just also in this respect is no breach on Claimant's side under the Contract.

159.   As a second defence, Respondent has argued that a contract annex (*"Anexo de Contrato"*) dated February 17, 2004 (i.e., one day after the Contract date) is not an annex but an amendment to the Contract modifying Articles 34 and 35 of the Contract and providing in clause 5 that five items of work set out in that clause needed to be completed before progress payments could be made. Claimant has disputed that the five items of work had not been completed as well as the interpretation of the contract annex on the following bases (1) the heading of the annex makes clear that it is an annex and not an amendment of the Contract; (2) Article 44 of the Contract refers to annexes and applies to the annex dated February 17, 2004; (3) Article 3 of the Contract provides that a contract annex forms an integral part of the Contract.

160.   Clause 5 of the *Anexo de Contrato* as provided in translation at paragraph 128 of Claimant's Memorial, checked against the translation provided by Mr. Battrick in his interim report which does not in relevant terms differs from Claimant's translation, is as follows:

*"On receipt of the 30% advance payment and before receiving any*

53

*other payment, the Company shall have completed the following work:*

- *Supply of all the equipment and machinery*

- *Establishment of offices and facilities*

- *Setting out and site clearance*

- *Earth movements*

- *Establishment of quarries"*

161.   Article 44 of the Contract reads as follows:

*"Article 44 – CONTRACTUAL UNIT*

*The present Contract including its annexes and/or other documents shall form an integral part of the Contract. In the event of any contradiction between any provisions of the Contract and/or its annexes, the provisions of the Contract shall prevail."*

162.   Article 3 of the Contract provides as follows:

*"Article 3 – CONTRACT DOCUMENTS*

*The following documents are an integral part of the Contract:*

*1. Contract award document.*

*2. Contract Annex document.*

*3. Service Order.*

54

.............."

163.  On this second defence, the Tribunal finds in favour of Claimant. The heading of the annex as well as articles 3 and 44 of the Contract in isolation or taken together point to the fact that the *Anexo de Contrato* was not a separate contract executed the day after the Contract but, although dated one day later, was part of the contractual relationship between the Parties as envisaged in the Contract, referenced to in Articles 3 and 44 and headed as a contract annex and not as a contract amendment or modification. Clause 5 forms, thus, part of the contract but contradicts the wording of Articles 34 and 35 of the Contract. In such case of contradiction, the priority or hierarchy clause of Article 44 applies in accordance with which the Contract pre-empts the annex. This interpretation is corroborated by Article 2 of the Contract which provides that payments under the Contract will be made in accordance with the Articles 33, 34 and 35.

164.  Moreover, Respondent in its November 23, 2009 Memorial at paragraphs 3 and 4 accepted that the *Anexo de Contrato* was part of the Contract which position it amended in its Rejoinder. At paragraph 4 of the Memorial above, Respondent argued that the Contract and the *Anexo de Contrato* were not contradictory but complementary. However, the Tribunal disagrees. Under Article 35 of the Contract, Claimant had a contractual right to payment upon providing the monthly payment requests whereas under Clause 5 of the *Anexo de Contrato* payment was conditional upon completing the five items referred to above.

55

165. The Tribunal's interpretation is further confirmed by minutes of a meeting dated March 23, 2004 where Respondent's consulting engineer on the project SNC Lavalin agreed that the advance payment was not to be considered as payment for the items listed in the *Anexo de Contrato* and as requiring completion before any further payments would be made (see Respondent's Memorial dated November 23, 2009 at paragraph 15).

166. Also, the comtemporeneous documents do not show that the Clause 5 argument was raised during the escalation of the disputes leading to the March 14, 2005 termination of the Contract by Claimant. It seems that the argument was first raised after the event in the Battrick report.

167. Moreover, the contemporaneous evidence for the period late 2004 to early 2005 does not provide evidence for Respondent's contention that the five items of work had not been completed. It was neither raised by Respondent nor by SNC Lavalin. Especially the latter would not have countersigned the monthly certificates if work had not been progressed and partly completed in accordance with the milestones and the programme schedule. Respondent has not disputed that four of the five items of work were timely completed; it limited its defence to movement of earth works. In this respect, SNC Lavalin in the monthly certificate (C-85, p. 2, line A009) signed off "movimiento de tierras" (movement of earth) as being 100% complete and valued at CFA 43,904,660. Thus, Respondent's case in this respect also fails in fact as movement of earth was certified by Respondent's own engineer to have been fully completed. Also, the Tribunal does not need to address Mr. Battrick's substitute definition of movement of earth at paragraph 3.14 of his interim report as being works such that the sub-base layer of stone could be

56

commenced. The terminology used by Claimant and endorsed by the Engineer when signing off certificates prevail over a definition developed by an expert who was not involved in the project and was retained after termination.

168. As a third defence, Respondent has stated that the requests for payment for October, November and December 2004 did not comply with Article 35 of the Contract. Respondent in this respect has pointed to the fact that (1) at a January 11, 2005 meeting, it was agreed that all certificates needed to be resubmitted and that all certificates were henceforth first to be sent to SNC Lavalin for its review and signature; (2) the second certificate did not comply with contractual requirements as it was sent simultaneously to Respondent and SNC Lavalin; (3) Respondent claims that the February 10, 2005 payment request also did not comply with contractual requirements; (4) payment was only to be made forty-five days after the February 10, 2005 SNC Lavalin signature and thus on March 28, 2005. On the basis of these arguments, Respondent has advocated that the March 14, 2005 termination was premature and, thus, without effect as there was no breach on its part.

169. Claimant has replied that (1) the first monthly application for payment was delivered to SNC Lavalin on November 11, 2004 (C-3/131-133), was either not forwarded to Respondent in due time or was not submitted for payment by the Ministry of Infrastructure and Woodlands to the Ministry of Finance and Budgets and was not paid by January 10, 2005; (2) the second monthly payment request (C70) was submitted to both Respondent and SNC Lavalin on December 15, 2004, was either not forwarded to Respondent in due time or was not submitted for payment by the Ministry of Infrastructure and Woodlands to the Ministry of

Finance and Budgets and was payable by February 13, 2005; (3) the third monthly payment request (C-83) was submitted to SNC Lavalin on January 12, 2005 by virtue of a January 11, 2005 meeting where it was agreed that payment requests were first to be submitted to SNC Lavalin and was payable by March 13, 2005; (4) these three monthly requests were all – although late – signed off by SNC Lavalin on February 10, 2005 (C-85); (5) Claimant was, thus, under the contract entitled to payment of these three monthly payment requests within a period of sixty days after issuance; (6) the two first monthly requests were already well overdue when Claimant terminated the Contract and the third request was due on or around March 13, 2005; (7) no payment was made on March 14, 2005 entitling Claimant to terminate the Contract.

170. Early February 2005, SNC Lavalin took issue with Claimant's monthly assessments submitted to it and considered that they needed to be revised for works done to December 31, 2004. The Engineer was of the opinion that some twelve line items for this period were to be reduced in total to some 77% of the value as assessed by Claimant (Claimant Memorial paragraphs 97-102). Claimant stamped and signed a new valuation for the period up to December 31, 2004 and the Engineer countersigned (C-85). Claimant considers that – even if the February 2005 assessment subsumes the previous assessments – it would be payable by March 13, 2005 as the third monthly assessment was issued on January 12, 2005. Respondent, on the other hand, considers that the monthly assessments for the period October-December 2004 were only properly certified by the Engineer on February 10, 2005 (letter produced at the hearing) and thus payable only by March 28, 2005 so that the termination of the Contract on March 14, 2005 was premature and without effect.

171.  Respondent has in this respect referred to a SNC Lavalin letter dated March 21, 2005 (C-71) in which the Engineer confirmed that the amounts claimed corresponded to the advancement of works in terms of installation, mobilization and construction up to December 31, 2004 but in which the Engineer indicated its position that the valuations corresponding to these amounts were only certified by it on February 10, 2005 and, thus, only payable by March 28, 2005. The Engineer concluded that in its opinion the termination of the Contract on March 14, 2005 was, thus, premature.

172.  A copy of page 1 of the original of the March 21, 2005 letter in Spanish was produced at the hearing and page 2 thereafter. The Tribunal notes however that a full copy of the original letter was already in Exhibit 36 of Claimant's Submission on Entitlement to Financial Recovery of April 24, 2006.

173.  Claimant has replied to the March 21, 2005 letter that the working arrangements between Respondent and the Engineer are an internal affair to them and do not prejudice upon its contractual right to payment within a period of sixty days (SRjCC par. 64).

174.  In examination of Mr. Cookson and Mr. Lemieux, Mr. Cookson testified that the three payment applications had been hand delivered by him to Mr. Adrian Constantinescu, SNC Lavalin's site engineer (Tr. Day 3, 484). Mr. Lemieux testified that he was unsure whether he had seen the applications but that in any event he had not worked on them (Tr. Day 3, 489-493).

175. Both also testified that during the January 6, 2005 meeting (C-3/156-157), no amendment to the Contract was agreed as to the certification process but that this process was only clarified (Tr. Day 3, 485 and 488).

176. From C-69, it is clear that the first monthly application had been received by the Ministry of Infrastructure and Woodlands. From C-70, it also appears that SNC Lavalin was copied into the first monthly application.

177. On the basis of the written evidence in the preceding paragraph and the witness testimony of Mr. Cookson which the Tribunal finds credible as to the submission of the three payment applications to the Engineer in November 2004, December 2004 and January 2005, there seem to have been two in part parallel payment and certification processes. In order to determine whether payments were due on the termination date of March 14, 2005, the Tribunal will first refer to the Contract.

178. Article 35 of the Contract is as follows:

> "*Article 35. TERMS OF PAYMENT – INTEREST FOR LATE PAYMENT*
>
> *The assessments of the work carried out shall be provided to the engineer at the end of each month or every eight to fifteen days. The engineer shall have a period of fifteen (15) days to check and record the state of performance of the work carried out and also to sign the monthly certificates.*
>
> *The monthly certificates for the work carried out by the Contractor shall be paid within a period of forty-five (45) days from signature or sixty (60) days from the date when they were sent by the Contractor to the engineer.*

60

> *Any payment made outside the periods established shall entitle the Contractor to claim interest for late payment calculated from the date of expiry of the payment deadline, at a rate of 1/2000 per day from the certificate."*

179. The contractual payment and certification process was thus clear: Claimant was entitled to payments on a regular basis within a period of forty-five days after certification by the Engineer or within a period of sixty days after submission of its application to the Engineer, whichever is the earliest. Article 35 of the Contract balances the rights of the Parties: no payments without submission for certification as well as payments within a period of sixty days if the Engineer fails to certify within a period of fifteen days.

180. On the basis of Article 35 of the Contract and the accepted evidence that Claimant submitted requests for payment to the Engineer on respectively November 11, 2004, December 15, 2005 and January 12, 2005, these payments were due on respectively January 10, 2005, February 13, 2005 and March 13, 2005. These payments were never made and Respondent, thus, seems to have been in breach of contract on March 14, 2005 when Claimant terminated the Contract.

181. The provisional conclusion now must be tested against the January 11, 2005 meeting. At that meeting, Article 33 of the Contract was not amended as the evidence of Mr. Cookson and Mr. Lemieux has shown. The Parties at that meeting clarified the payment and certification process and provided that requests for payment were not also to be submitted to Respondent but only to the Engineer. The

61

practice thereafter was to the effect that a certification would be signed not only by Claimant and the Engineer but also later by the Ministry of Infrastructure and Woodlands.

182.    The key question is whether this new payment and certification process was to be followed for new requests or would apply also to outstanding requests. For Claimant, it would not have retrospective effect and Respondent takes the opposite view.

183.    Both Mr. Cookson and Mr. Lemieux have testified that the January 11, 2005 meeting did not purport to amend the contract but only to clarify the payment and certification process. The Tribunal considers that on the basis of this evidence, Article 33 of the Contract applies to the outstanding requests for payment and the three requests were, thus, payable by the time Claimant terminated the Contract. Respondent having failed to timely pay these three payment requests was thus in breach by the date of the termination. The Engineer was in possession of the requests, failed to certify within a period of fifteen days and the sixty day period for payment continued to run. The Ministry of Infrastructure and Woodlands was also in possession of the three requests and failed to coordinate with the Engineer as to certification. From November 11, 2004 when the first request was submitted to both the Engineer and the Ministry to the termination date of March 14, 2005, insufficient action was undertaken to certify and to proceed to payments. The Engineer belatedly requested further information on January 27, 2005 (letter produced at the hearing) as to Claimant's outstanding requests while this should have been done much earlier as the first request dates from November 11, 2004.

184.  In this respect, the Tribunal is not convinced by the March 21, 2005 letter of the Engineer as its position is based on the interpretation of Article 33 of the Contract as applied to the facts for which it is not qualified and which cannot change the analysis of the Tribunal.

185.  From the above, it appears that Respondent was in breach which raises the question whether Claimant was entitled to terminate the Contract on that basis. In this respect, Claimant has invoked both Article 33, second paragraph sub a) of the Contract as well as Article 1124 of the Civil Code of Equatorial Guinea. Respondent has primarily addressed only Article 33 of the Contract.

186.  Under Article 33, second paragraph sub a) of the Contract (C-1), *"The Contractor may cancel the present Contract for the following reasons: a) When the Client interferes with, obstructs or refuses any approval needed to issue any of the Certificates."*

187.  No sufficient evidence has been produced as to the interpretation of that provision as it may also apply to work or other administrative permits nor that Respondent or any of its organs interfered with the issuance of certificates by the Engineer, obstructed the work of the Engineer or refused any approval that the Engineer needed to issue the certificates. The evidence is rather to the contrary as Mr. Lemieux testified that no such interference, obstruction or refusal occurred in relation to his certification activities. For that reason, Claimant's request for declaratory relief in relation to Respondent's management of the Contract will be dismissed.

188.  On the other hand, Article 1124 of the Civil Code of Equatorial Guinea (C-102) provides for rescission of contracts in reciprocal contracts in case of breach. The Tribunal finds that this is an appropriate legal rule to apply by virtue of Article 17 ICC Rules as it is an expression of a general principle in legal systems based on Roman law.

189.  On the basis of the above, Claimant has sufficiently proven that there was a breach of contract by Respondent in not timely making three payments when due which entitled Claimant to rescind the Contract. Also, Respondent has not convinced the Arbitral Tribunal that any of its defences as to Claimant's breach of contract cause of action have merits. The Tribunal, thus, concludes that Claimant was entitled to terminate the Contract on March 14, 2005 on the basis of Article 1124 of the Civil Code of Equatorial Guinea (C-102) providing for termination of reciprocal contracts in case of breach by a party. The Tribunal will rule accordingly with regard to Claimant's prayer for relief regarding termination.

IV.5.2 Quantum

190.  In its Submission on Entitlement to Financial Recovery dated April 24, 2006, Claimant submitted its claims for a total amount of CFA 14,939,299,635 (some € 22,774,800) to Respondent.

191.  In its Memorial dated September 1, 2009, Claimant increased its claims to a total amount of € 150,652,966.40 (excluding interest, lost opportunities regarding projects outside Equatorial Guinea and the residual value of the quarry).

64

192.  As to quantum, Claimant has advanced the following heads of claim: (1) payment of certified amounts and other work performed; (2) lost profit on the basis of a profit margin range between 25% and 30% or between € 35,063,273.75 and € 42,075,928.50; (3) additional costs and liabilities directly resulting from Respondent's actions; (4) the residual value of Claimant's assets including plant and quarry; (5) missed opportunities to undertake additional projects; and (6) interest entitlements.

193.  Claimant has reduced the maximum amount of lost profit at € 42,075,928.50 with a credit of € 1,746,350 the latter being the balance between the down payment received at € 42,075,928.76 and total expenditure on the project at € 40,329,578.55. Thus, Claimant under the head of lost profits claims € 40,329,578.50.

194.  Claimant has indicated that its head of claim for payment of work performed is alternative for its claim for lost profits if such claim were not successful.

195.  Under this head additional costs at € 11,027,923 are also claimed. In this respect, Claimant refers to (1) costs related to the preliminary works to be extended into the dry season and delaying bulk excavation work as a result of Respondent's failure to make the progress payments; (2) the provision of land for temporary occupation which was unsuitable and caused increased site overhead costs including costs of reclaiming a virtual swamp for use as the compound and which was additional work for which a variation order should have been issued; (3) increased design costs in relation to late retainer of an Engineer and late approval of the design by the Engineer; (4) costs related to Respondent's demand for a bond on terms more

65

onerous than required under the Contract; (5) unjustified currency exchange charges amounting to CFA 317,285,259 (equal to € 483,698) for transfer of funds out of Equatorial Guinea in breach of Article 2 of the Contract; (6) costs related to capital contributions from Claimant's shareholders and affiliates to make up for the short falls caused by Respondent; (7) costs related to Respondent's inherent approach to the Contract involving lack of co-operation, obfuscation, delay, harassment and abuse.

196. Under its head "additional costs and liabilities incurred as a result of premature termination" at € 400,865, Claimant seeks reimbursement of payments to local and expatriate staff in relation to wages and benefits, logistical costs, professional costs and management time incurred in negotiating with Respondent in terms of the termination of the Contract and attempts to secure alternative arrangements. Claimant also referred to liabilities in the form of loans and other liabilities to shareholders, affiliates and third parties but has not quantified these liabilities.

197. Under the head "Loss of opportunities: other contracts", Claimant has referred to prospects for further contracts with Respondent and future contracts outside Equatorial Guinea. In Claimant's opinion, the drain on its capital and the loss of experienced personnel led to direct losses of profits and contribution to overhead costs that would have accrued to Claimant from a number of other projects where the negotiations had been completed, contracts signed or finance put in place. Claimant has assessed these lost opportunities at € 83,737,375.90 for future projects in Equatorial Guinea over a period of ten years at an annual profit of €

66

12,856,533.70 with a 10% discount rate and at € 134,660,000 for some six projects in Kazakhstan, Nepal, Yemen and Ghana.

198.  Under the head "loss of residual value of plant and quarry", Claimant refers to the expropriation of its plant and equipment by virtue of government attachments on these assets and values these assets at € 15,157,224. It has not provided a further quantification of its claim in relation to the quarry.

199.  As to interest, Claimant refers to Article 35 of the Contract which provides an agreed interest rate of 1/2000 per day or 18,25%. Alternatively, Claimant has referred to a fair commercial rate as compensation for having been kept out of its money for a protracted period.

200.  Respondent has challenged Claimant's quantum calculations. It has disputed that alleged losses under other contracts can be claimed in these arbitration proceedings as those contracts were not concluded by Claimant but by FIL or Fitzpatrick Contractors Limited (International Division). In its view, only damages suffered and profits lost in relation to the Contract and directly and foreseeably caused by an alleged breach can be compensated. Respondent has also disputed the profit margin of 30% (as advocated in C-89, WS Mr. Fitzpatrick par. 38) that Claimant used as a basis for its damages claim (Memorial C. Quantum, paragraphs 12).

201.  After a summary of the Parties' positions as to quantum, the Tribunal will now analyse Claimant's respective heads of claim.

202.  As to Claimant's lost profit for a maximum of € 42,075,928.50 at a profit margin of
      30%, the Tribunal agrees with Respondent that a 25-30% profit margin cannot be
      accepted as there is insufficient evidence to support any such margin and that
      Respondent has sufficiently disputed this range. Claimant was thus under a strict
      burden of proof to support the alleged profit margin. The Tribunal, thus, retains the
      10% profit margin that Claimant has referred to in its April 24, 2006 Submission on
      Entitlement to Financial Recovery as a contemporaneous and more realistic margin
      and allocates € 14,025,309.16 (€42,075,928.50 or 30% of the Contract sum divided
      by three or 10% of the Contract sum) as lost profit.

203.  As indicated by Claimant, the amount of lost profit above at € 14,025,309.16 is to
      be credited with € 1,746,350.21 the latter being the balance between the down
      payment received at € 42,075,928.76 and total expenditure on the project at €
      40,329,578.55. The Tribunal, having reviewed the evidence and the Parties'
      submissions accepts the amounts submitted by Claimant for the advance payment
      and for total expenditure which the Respondent has insufficiently contested. In this
      respect, the Tribunal is also guided by the fact that the March 21, 2005 letter of the
      Engineer confirmed that the progress of the works was properly reflected in
      Claimant's payment request for the period up to December 31, 2004 and that the
      Engineer also certified payment requests beyond that period (Certificate No. 2 for
      January 2005 at C-3/184; Certificate No. 3 for February 2005 at C-3/191,
      Certificate No. 4 for March 2005 at C-3/195). As these contemporaneous
      documents have ample evidentiary weight, the Tribunal does not need to give such
      weight to the substitute contracts which Respondent concluded with contractors to

finish the highway after termination and the amounts involved which Respondent submitted on September 15, 2010.

204. Thus, Claimant under the head of lost profits is awarded € 12,278,958.95 (*i.e.*, € 14,025,309.16 as lost profits credited with € 1,746,350.21).

205. Claimant has indicated that its head of claim for payment of work performed is alternative for its claim for lost profits if such claim were not successful. The Tribunal having awarded a claim for lost profits, it does not need to address this alternative claim. Also, total expenditures have been set off against the advance payment so that works performed have been taken into account.

206. However, under this head at € 11,027,923, Claimant refers also to the following additional costs for works prior to termination: (1) costs related to the preliminary works to be extended into the dry season and delaying bulk excavation work as a result of Respondent's failure to make the progress payments; (2) the provision of land for temporary occupation which was unsuitable and caused increased site overhead costs including costs of reclaiming a virtual swamp for use as the compound and which was additional work for which a variation order should have been issued; (3) increased design costs in relation to late retainer of an Engineer and late approval of the design by the Engineer; (4) costs related to Respondent's demand for a bond on terms more onerous than required under the Contract; (5) unjustified currency exchange charges amounting to CFA 317,285,259 (equal to € 483,698) for transfer of funds out of Equatorial Guinea in breach of Article 2 of the Contract; (6) costs related to capital contributions from Claimant's shareholders and

affiliates to make up for the short falls caused by Respondent; (7) costs related to Respondent's inherent approach to the Contract involving lack of co-operation, obfuscation, delay, harassment and abuse.

207. All these cost items are to be dismissed. Items (2) and (3) do not meet the contractual requirements for a variation order or similar request to amend the Contract. Claimant ought to have presented a variation request prior to incurring these costs. Similarly as Respondent's position in relation to the guarantee, a claim must be presented as it arises. It cannot be formulated first after termination and must be deemed to have waived. As to cost item (1), Claimant has not proven that those costs were directly caused by Respondent's failure to promptly make progress payment nor has it substantiated these costs. Items (4), (5) and (6) also have not been substantiated as to quantum and item (7) has not been substantiated as to breach, causation and quantum. For the same reasons, Claimant's requests for declaratory relief in relation thereto will also be dismissed.

208. Under its head "additional costs and liabilities incurred as a result of premature termination" at € 400,865, Claimant seeks reimbursement of payments to local and expatriate staff in relation to wages and benefits, logistical costs, professional costs and management time incurred in negotiating with Respondent in terms of the termination of the Contract and attempts to secure alternative arrangements. Claimant also referred to liabilities in the form of loans and other liabilities to shareholders, affiliates and third parties but has not quantified these liabilities. As these claims have not been substantiated as to quantum, these are to be dismissed.

209.   Under the head "Loss of opportunities: other contracts", Claimant has referred to prospects for further contracts with Respondent and future contracts outside Equatorial Guinea. Claimant has assessed these lost opportunities at € 83,737,375.90 for future projects in Equatorial Guinea over a period of ten years at an annual profit of € 12,856,533.70 with a 10% discount rate and at € 134,660,000 for some six projects in Kazakhstan, Nepal, Yemen and Ghana. The latter have only been referred to as to quantum in a footnote and must be dismissed as not substantiated. Furthermore, Respondent has rightly noted that these contracts were not Claimant's; Claimant was a special purpose vehicle incorporated under the laws of Equatorial Guinea for purposes of the airport highway project and maybe for future other projects in Equatorial Guinea but is was not foreseen or foreseeable that it would operate in relation to construction projects outside Equatorial Guinea. Damages incurred upstream in the Fitzpatrick group are thus not recoverable as damages of Claimant as they are the parent company's or an affiliate company's damages but not those of Claimant.

210.   As to lost opportunities in Equatorial Guinea, Claimant has referred to prospects for future construction contracts but failed to specify how advanced these negotiations or contracts were. Its evidence is conjectural and, for that reason, its claims for lost opportunities in Equatorial Guinea fail.

211.   The above implies that Claimant's head of claims in relation to lost opportunities in and outside Equatorial Guinea are dismissed.

212. Under the head "loss of residual value of plant and quarry", Claimant refers to the expropriation of its plant and equipment by virtue of government attachments on these assets and values these assets at € 15,157,224. It has not provided a further quantification of its claim in relation to the quarry. This claim fails for two reasons. First, this Tribunal has no jurisdiction to deal with investor claims against a State for breach of treaty or other rights under public international law regarding expropriation or other acts or omissions engaging the international responsibility of host states towards foreign investors. The Tribunal's jurisdiction only extends to the disputes between the Parties in relation to the Contract. Claimant has insufficiently pleaded its case that Respondent's actions through different administrations, its Public Prosecutor's office or its courts amount to a violation of a contractual right which may be remedied by a claim for compensation for damages incurred. Respondent through its various organs may well have acted in the exercise of its sovereign powers for instance to protect payment of salaries of Claimant's employees or creditors. In its award on preliminary issues, the Tribunal has held that it did not recognize the insolvency order over Claimant issued by the courts of Equatorial Guinea for failure to give proper notice to Claimant and, thus, has denied Claimant's trustee in bankruptcy the right to represent Claimant in this arbitration. This Tribunal has in its award on preliminary issues extended no finding of fact or law to any issue to be decided in this award. Consequently, the Tribunal – absent further evidence and substantiation which is lacking – cannot assess whether the events post termination in Equatorial Guinea constitute a breach of contract which warrant compensation to Claimant for the residual value of its assets such as plant, equipment and quarry.

72

213.    Claimant's claim for compensation in relation to the residual value of its assets in Equatorial Guinea also fails for lack of substantiation on quantum. The quarry claim has never been substantiated and the Tribunal does not have any information as to how the residual value of the plant and the equipment is to be determined.

214.    For the reasons above, the claims as to the residual value of Claimant's assets in Equatorial Guinea to which it no longer has access and are the subject of insolvency proceedings in Equatorial Guinea are dismissed.

215.    As to interest, Claimant refers to Article 35 of the Contract which provides an agreed interest rate of 1/2000 per day or 18,25%. Alternatively, Claimant has referred to a fair and continuing commercial rate as compensation for having been kept out of its money for a protracted period.

216.    Article 35 of the Contract relates, however, to interest on late progress and other payments. By and large and in relation to the termination of the Contract, Claimant has been compensated for works performed through the advance payment. From the discussion above, it appears that total expenditures as advanced by Claimant and accepted by the Tribunal were covered by the advance payment and that the claims admitted by the Tribunal relate to profits lost on the Contract and which are claimable upon the termination of the Contract. The Tribunal, thus, accepts Claimant's alternative position that interest on lost profits is to be determined on the basis of a fair commercial interest rate.

217.  In relation to its counterclaims, Respondent had advanced a 5% annual interest rate compounded on a three month basis. The Tribunal has been guided by this figure as it finds this an appropriate and fair commercial interest rate for the period after the termination on March 14, 2005 up to payment. Consequently, Respondent will be ordered to pay interest at a rate of 5% per year on the lost profits head of damages as of March 14, 2005 until full payment. As Claimant at paragraph 215 of its Memorial calculated interest on a simple basis and did not sufficiently request compound interest, only simple interest will be granted.

218.  The Tribunal has reviewed the Final Battrick Report submitted by Respondent on August 4, 2010. It did not find any new elements in that Report which shed a new light on the quantum issues discussed above and, thus, the Tribunal has not given evidentiary weight to it. The Tribunal also has not been guided by opinions expressed in the Report on legal issues as Mr. Battrick is not qualified to do so and the Tribunal has been excellently briefed on facts and legal arguments by Counsel.

219.  Finally, Claimant has requested that any monies due under this Award be paid to its Counsel's client account in London. Respondent has objected to this prayer for relief. The Tribunal agrees with Respondent and will dismiss this prayer for relief. Although the Tribunal under Article 35 ICC Rules shall make every effort to make sure that the award is enforceable at law, the Tribunal considers that the amended prayer for relief was filed too late to be taken into account in the Tribunal's deliberations and award as the amendment required more substantial briefing than merely by exchange of counsel letters. In this respect, Respondent has made reference to Article 19 ICC Rules under which new claims can only be made with the authorization of the Tribunal which should consider the nature of such new

74

claims, the stage of the arbitration and other relevant circumstances. Claimant has advocated that a new prayer for relief is not a new claim for purposes of Article 19 ICC Rules. The Tribunal considers that the qualification as claim or prayer for relief is not relevant for its decision as the amended prayer for relief can be dismissed either by direct application of Article 19 or on the basis of an underlying principle of good administration of justice that amendments of prayers for relief are not to be accepted after the merits hearing, certainly when they raise complex issues including the fact that an Enforcement Order regarding the Equatorial Guinean bankruptcy judgment was rendered by the Paris District Court on April 28, 2011.

IV.6    Arbitration Costs

220.    Each Party has requested that the other Party be ordered to bear its costs of legal representation including attorney's fees and expenses as well as the ICC administrative expenses and the fees and expenses of the arbitrators. On April 29, 2010, the Parties communicated their cost submissions to the Tribunal. Claimant's cost submission is for GBP 3,465,956.83 and € 124,050.01 for the period 2005-2010. Respondent's costs submission as of the start of the arbitration proceedings is at GBP 75,000 and € 641,493.35.

221.    By virtue of Article 31 (3) of the ICC Rules of Arbitration, a final award shall fix the costs of the arbitration and decide which of the Parties shall bear them or in what proportion they shall be borne by the Parties.

222.  As Claimant has prevailed on the preliminary issues as well as on liability and in part on quantum while Respondent's counterclaims were deemed to be withdrawn by virtue of Article 30 (4) of the ICC Rules and Respondent did not incur many costs in defending the quantum part of the proceedings, the Tribunal does not see a reason not to order Respondent to contribute in Claimant's costs of legal representation including legal and other costs.

223.  However, the Tribunal considers that pre-arbitration costs are not to be reimbursed neither are costs related to proceedings parallel to the arbitration as those costs are not costs of legal representation regarding this arbitration. Also, the Tribunal fails to see how 100% management time of some FIL staff or substantial office rent can be deemed costs of this arbitration. Taking this into account, the Tribunal has decided to ignore all amounts claimed in euro at € 124,050.01, to reduce all pre-arbitration costs estimated at GBP 220,000 based on Claimant's cost submission and to reduce management time and costs by 75% estimated at some GBP 1,700,000 based on Claimant's cost submissions.

224.  The conclusion is that total costs in GBP at GBP 3,465,956.83 are to be reduced by GBP 220,000 as well as by GBP 1,275,000 (GBP 1,700,000 x 75%) which brings the cost order for costs of legal and other representation in relation to these arbitration proceedings as to both the preliminary issues and the merits to GBP 1,970,956.83.

225.  Claimant has paid a total amount of US$ 865,000 to the ICC as an advance on costs while Respondent has paid an amount of US$ 200,000.

226.  As Claimant has by and large prevailed in these proceedings as set forth above, Respondent will be ordered to pay the ICC administrative expenses as well as the fees and expenses of the arbitrators. At its session of December 21, 2011, the ICC Court fixed the ICC administrative expenses and the fees and expenses of the arbitrators at US$ 865,000. Respondent having paid US$ 200,000 and Claimant having paid US$ 865,000 as advances on costs and US$ 200,000 being reimbursed by the ICC to Claimant, the Tribunal will order Respondent to pay US$ 665,000 to Claimant as reimbursement of the latter's arbitration costs.

## ON THE BASIS OF THE FOREGOING CONSIDERATIONS,
## THE FOLLOWING FINAL AWARD IS RENDERED

The Arbitral Tribunal

1.  declares that Respondent is in breach of Articles 35 of the Contract by failing to make timely payments when due;

2.  dismisses Claimant's request for a declaration that the Respondent is in breach of Article 33(a) of the Contract and also the Civil Code by failing to properly administer the Contract;

3.  subject to 1. above, dismisses Claimant's request for a declaration that the Respondent is in breach of the Civil Code and Articles 6 and 33(a) of the

77

Contract by failing to make payments in accordance with certificates issued by the Engineer;

4. dismisses Claimant's request for a declaration that the Respondent is in breach of the Contract and the Civil Code by failing to provide appropriate land for logistical purposes, to ensure that roads used by the Claimant were in good condition and to enter into a further arrangement in respect of additional work;

5. declares that Claimant validly and legitimately terminated the contract pursuant to the Civil Code and is entitled to compensation from Respondent for the losses suffered as a result of that termination and the breaches of the Civil Code;

6. dismisses Claimant's request for a declaration that it is entitled to compensation from Respondent for losses as a result of actions taken in response to Claimant's termination of the Contract by the Respondent;

7. dismisses Claimant's request for a declaration that the Claimant is entitled to an indemnity from Respondent in respect of third party liabilities incurred by the Claimant as a result of the Respondent's breaches and the termination of the Contract;

8. orders Respondent to pay to Claimant compensation in the sum of € 12,278,958.95 for lost profit as a result of termination;

9. dismisses Claimant's requests for money orders regarding additional payments prior to termination of the Contract;

10. dismisses Claimant's requests for an order regarding costs and liabilities incurred by the Claimant as a result of premature termination of the Contract;

11.  dismisses Claimant's request for compensation regarding loss of the opportunity to make the profit which the Claimant would have made under other contracts had its assets not been expropriated and its business destroyed by the Respondent's breaches;

12.  dismisses Claimant's request for compensation regarding the residual value of Claimant's assets (including plant and the quarry);

13.  orders Respondent to pay simple interest at a rate of 5% per year on the amount of € 12,278,958.95 for lost profit as a result of termination as of March 14, 2005 until final payment;

14.  orders Respondent to pay to Claimant an amount of GBP 1,970,956.83 as Claimant's costs and expenses arising out of this arbitration;

15.  orders Respondent to bear in full the costs of the arbitration as fixed by the ICC Court, *i.e.* US$ 865,000. Respondent having paid already US$ 200,000 as advance on arbitration costs, Respondent is ordered to pay to Claimant US$ 665,000;

16.  dismisses Claimant's request to order Respondent that any and all amounts awarded to the Claimant under this award as above be paid to its counsel's client account.

Made in Paris as place of the arbitration, December 23, 2011

Mr. Gwyn Owen
Arbitrator

Prof. Philippe Leboulanger
Arbitrator

Prof. Dr. Filip De Ly
Chairman

DEED OF ASSIGNMENT OF AN ARBITRAL AWARD

DATED

7 JANUARY 2012

IN RESPECT OF AN ARBITRATION PROCESSING UNDER THE RULES OF THE
INTERNATIONAL CHAMBER OF COMMERCE CASE NO: 14576/ CC0/RF

KING & SPALDING

# CONTENTS

**CLAUSE**

1.   Assignment ....................................................................................................... 1
2.   Costs.................................................................................................................. 2
3.   Further assurance .............................................................................................. 2
4.   Governing law and jurisdiction......................................................................... 2

**THIS DEED** is dated 7 January 2012

**PARTIES**

(1)     **FITZPATRICK EQUATORIAL GUINEA LIMITED**, a company existing under the laws of the Republic of Equatorial Guinea whose registered office is at Avenida de la Independencia, Malabo, Republic of Equatorial Guinea ("**Assignor**").

(2)     **FITZPATRICK INTERNATIONAL LIMITED**, a company incorporated and registered in England and Wales with company number 0319436 whose registered office is at 10 Fitzroy Square, London, W1T 5HP, United Kingdom ("**Assignee**").

**BACKGROUND**

(A)     The Assignor is a party to a contract with the Government of the Republic of Equatorial Guinea ("**EG**") for the construction of a highway from Malabo Airport to Ela Nguema in the Republic of Equatorial Guinea (the "**Contract**").

(B)     Following certain disputes arising between the parties to the Contract, the Assignor brought arbitration proceedings against EG under the rules of the International Chamber of Commerce, Case No. 14576/CC0/JRF (the "**Arbitration**").

(C)     The Assignee has acted on behalf of the Assignor in the Arbitration pursuant to a Services Agreement dated 8 March 2006 under Power of Attorney granted on even date.

(D)     The Arbitral Tribunal appointed in the Arbitration delivered an award in favour of the Assignor on 23 December 2011 (the "**Award**").

(E)     The parties acknowledge inevitable difficulties facing the Assignor as a company incorporated in Equatorial Guinea to successfully enforce the Award within Equatorial Guinea, and the Assignor has wishes to assign the benefit of the Award to the Assignee to take steps to enforce the Award on behalf and for the benefit of Assignor and its shareholders.

**AGREED TERMS**

1.      **ASSIGNMENT**

1.1     The Assignor assigns all its rights, title, interest, and benefit in and to the Award and any financial or beneficial entitlement arising from or in connection with it, to the Assignee whether vested in it on the date of this Deed or arising at any time thereafter.

1.2     The Assignor makes the assignment described in Clause 1.1 above at market value.

1.3 The Assignee shall use reasonable endeavours to enforce the Award outside Equatorial Guinea.

1.4 The Assignor shall provide any assistance reasonably required to enable the Assignee to enforce the Award and shall notify EG in writing of the existence of this Deed and its relevant terms.

2. **COSTS**

The Assignee shall meet the costs incurred and arising from entry into this Deed and in the enforcement of the Award to the account of the Assignor in accordance with the terms of the Service Agreement described in Recital (C) or as may be agreed between the parties from time to time.

3. **FURTHER ASSURANCE**

Each party shall do, or procure the doing of, all acts and things, and execute, or procure the execution of, all documents, as may reasonably be required to give full effect to this Deed and for effective enforcement of the Award.

4. **GOVERNING LAW AND JURISDICTION**

4.1 This Deed and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with English law.

4.2 The parties irrevocably agree that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this Deed of Assignment or its subject matter or formation (including non-contractual disputes or claims).

This document has been executed as a **DEED** and is delivered and takes effect on the date stated at the beginning of it.

2

Executed as a **DEED** by
**FITZPATRICK EQUATORIAL**
**GUINEA LIMITED** acting by
**MR. STUART WARD**

Managing Director

In the presence of

Name: SUSANNA MARSHALL
Address: 125 OLD BROAD ST
Occupation: SOLICITOR

Executed as a **DEED** by
**FITZPATRICK INTERNATIONAL**
**LIMITED** acting by **MR. PATRICK**
**A. FITZPATRICK**

Director

In the presence of

Name: CASTAIGNE EDWIGE
Address: 1 rue de l'Oratoire 06160 Juan les Pins France.
Occupation: none

3